## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

ROBERT M. MILLER,
          *Plaintiff,*

    v.

MERRICK B. GARLAND, U.S. Attorney General,
U.S. DEPARTMENT OF JUSTICE; STEVEN
DETTELBACH, Director, Bureau of Alcohol
Tobacco, Firearms, and Explosives; BUREAU
OF ALCOHOL, TOBACCO, FIREARMS AND
EXPLOSIVES,
          *Defendants.*

Civ. Case No:   1:23 CV 195

FILED 2023 FEB 13 AM 11:2?

## VERIFIED COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

COMES NOW Plaintiff Robert M. Miller, *pro se*, pursuant to Federal Rules of Civil Procedure and for his claims seeking declaratory and injunctive relief as follows:

## INTRODUCTION

1. On June 10, 2021, Defendants promulgated a Notice of Proposed Rulemaking ("NPRM") regulating stabilizing arm braces on firearms.

2. On January 31, 2023, Defendants issued a final rule *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* RIN 1140-AA55, 88 FR 6478, amending the Code of Federal Regulations, Title 27, Parts 478 and 479. ("Rule")

3. As described below, Plaintiff suffers irreparable, imminent and ongoing, concrete, and particularized harm from the Rule giving him standing to sue to have the Rule held unlawful and set aside under the Administrative Procedure Act, 5 U.S.C. § 701 et seq.

4. The Rule was promulgated under the authority of the National Firearms Act of 1934, Pub. L. 73-474 ("NFA") and the Gun Control Act of 1968, Pub. L. 90-618 ("GCA"); which

are the federal statutes under which Plaintiff's actions and property are regulated. Thus, Plaintiff's interests in his firearms are within the zone of interest regulated by those statutes.

5.   Handguns, pistols, rifles, shotguns, and firearms are generally regulated by Title I of the GCA. Title I firearms are generally not required to be registered by the purchaser under federal law.

6.   Defendants possess information on commercially manufactured Title I firearms only until the point of sale, and Defendants must upon probable cause seek the first-purchaser's information from FFLs.

7.   Defendants generally possess no information on privately-made Title I firearms.

8.   Short-barreled rifles, short-barreled shotguns, silencers, destructive devices, machineguns, and "any other weapons" are regulated by the NFA and Title II of the GCA.

9.   Title II firearms must be registered into the National Firearms Registration and Transfer Record ("NFRTR" or "NFA Registry").

10.   For SBRs and SBSs, the NFA Registry receives and contains information on the owner's name and address, the manufacturer or maker, model, serial number, caliber, barrel length, and overall length.

11.   A handgun is defined by the GCA as "a firearm which has a short stock and is designed to be held and fired by the use of a single hand," and "any combination of parts from which" a handgun "can be assembled." 18 U.S.C. § 921(a)(30).

12.   A pistol, which is a type of handgun, is defined as "a weapon originally designed, made, and intended to fire a projectile from one or more barrels when held in one hand that has both a chamber as an integral part of, or permanently aligned with, the bore and a short

stock designed to be gripped by one hand at an angle to and extending below the line of the bore." *See* 27 C.F.R. 478.11 and 479.11.

13. A rifle is defined by the GCA as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifle bore for each single pull of the trigger." 18 U.S.C. § 921(a)(7).

14. A short-barreled rifle ("SBR") is defined by the GCA as "a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." 18 U.S.C. § 921(a)(8).

15. A stabilizing arm brace ("brace") is a device attached to the rear of a firearm that better enables a person to fire with one hand, often someone with a disability. While the shooter holds the pistol grip, the brace attaches to or sits alongside the shooter's arm, typically but not necessarily the forearm.

16. Braces come in several different styles, including cuff-type, counterbalance-type, and blade-type.

17. From 2012 to 2020, Defendants issued numerous determinations and classifications saying attaching braces to pistols and firing the weapon from the shoulder did not convert the pistol into an NFA-regulated SBR.

18. Defendants' contention in the Rule is that almost all pistols fitted with stabilizing arm braces are, and *always have been*, SBRs.

19. The Rule has therefore declared Plaintiff and millions of other Americans owning braced pistols to be in violation of those statutes. For each firearm in violation of these statutes,

the law provides a maximum penalty of confinement for ten years, a $250,000 fine, forfeiture of the unlawful firearm, and a permanent loss of the right to keep and bear arms.

20. The Rule demands Plaintiff's compliance with those statutes no later than May 31, 2023.

21. The Rule provides for a forbearance of the $200 NFA tax, but Plaintiff will incur additional costs and burdens such as NFA engraving, restrictions on interstate transport, restrictions on sale and transfer, and exposure to existing state-level bans on SBRs (but not pistols).

22. To register his braced pistols into his NFA Firearms NFA Trust ("NFA Trust") without paying the NFA tax, Plaintiff had to transfer those firearms to his NFA Trust with a notarized document prior to the effective date of the Rule. Thus, the Rule requires Plaintiff register the firearm as an "Individual," and Plaintiff would have to pay a $200 transfer tax to move his firearms to possession of his NFA Trust.

23. Defendants' Rule has caused widespread angst, panic, confusion and unjust costs for millions of Americans, including Plaintiff, trying to comply with the Rule's numerous vague provisions and restrictions that arbitrarily and capriciously change Defendants' prior classifications, upon which Plaintiff and others had reliance interests.

24. The Rule exceeds Defendants' statutory authority; it is arbitrary and capricious; it was promulgated without procedures required by law having been followed, and it violates the Second, Fourth, Fifth, and Tenth Amendments.

25. The Rule's cost-benefit analysis ignored millions, if not billions, of dollars of costs to regulated persons and the firearm industry. The Rule's scale and scope are so sweeping that Congress could not have intended to confer such rulemaking authority on the Defendants.

26. Defendants purportedly promulgated the Rule as an interpretative rule subject to lesser procedural requirements. As an interpretative rule, the Rule would have no binding legal effect on regulated parties, but the Rule clearly imposes such binding effects.

27. As a legislative rule, Defendants failed to comply with the APA, the Congressional Review Act ("CRA"), the Small Business Regulatory Enforcement Fairness Act ("SBREFA"), the Unfunded Mandates Reform Act ("UMRA"), OMB Circular A-4, and Executive Orders 12866 and 13563.

28. Whatever level of deference this Court applies, the statutes are not vague or silent, and if they were, Defendants' interpretations are not permissible constructions of the statutes.

29. What Defendants call a "loophole," is actually called "lawful." That Congress failed to anticipate lawful reactions and product design and development 55 and 89 years ago does not empower the Agency to rewrite the NFA and GCA, which is a power reserved to Congress.

30. The Rule failed to monetize or quantify the benefits of the Rule; the Agency simply waved its hand in the air claiming substantial benefits without proving the existence of those benefits. In any event, the costs of the Rule far outweigh its benefits.

31. The Rule failed to consider alternative regulatory approaches and to appropriately respond to commenters.

32. The Rule was not based upon any newfound understanding or analysis of firearm design, but was motivated purely by partisan politics to unlawfully regulate or ban certain firearms.

33. The Rule, NFA, and GCA violate the Second Amendment because braced pistols and SBRs are bearable arms in common use for lawful purposes. SBRs and SBSs pre-existed the Second Amendment and were virtually unregulated until the NFA was enacted. SBRs are

neither dangerous nor unusual. They are indisputably less dangerous than longer-barreled rifles shotguns and less concealable than the pistols Defendants admit they cannot regulate. They are commonly used for sporting purposes and self-defense.

34. Consequently, this Court must hold unlawful and set aside the Rule pursuant to 5 U.S.C. § 701 et seq. The Court must hold the Rule, the NFA, the GCA, Defendants' determinations, and 18 U.S.C. §922(r) unconstitutional.

## PARTIES

35. Plaintiff is a natural person and a citizen of the United States and the Commonwealth of Virginia, residing in Loudoun County, Virginia.

36. Defendant Merrick B. Garland is the United States Attorney General and head of the U.S. Department of Justice, a federal government agency.

37. Defendant Steven Dettelbach is the Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, a bureau within the U.S. Department of Justice, ("Agency" or "ATF").

## JURISDICTION AND VENUE

38. This Court has jurisdiction for this action under 28 U.S.C. § 1331 and 5 U.S.C. § 702.

39. Declaratory judgment and relief are authorized under 28 U.S.C. § 2201-2202.

40. This Court has inherent powers of injunctive relief under U.S. Const. Art. III, Sec. 2.

41. The Rule is a final rule made reviewable by the Administrative Procedure Act for which there is no other adequate remedy in a court. 5 U.S.C. § 704.

42. Venue is proper under 5 U.S.C. § 703 and 28 U.S.C. § 1391(e)(1)(C).

## STATEMENT OF FACTS

### A.   Facts Concerning Plaintiff

43.   Plaintiff has an M.A. and Ph.D. in Economics from the University of Illinois (1995, 2002), and a B.S. in Mathematics and Economics from the University of Colorado at Denver (1992).

44.   Plaintiff is a Senior Financial Economist for a Federal financial regulator, whose regular duties involve conducting cost-benefit analysis for agency rulemaking, and analyzing rules for compliance with, *inter alia*, the Administrative Procedure Act, Congressional Review Act, Regulatory Flexibility Act, Small Business Regulatory Enforcement Fairness Act, Executive Orders 12866 and 13563, and Office of Management and Budget Circular A-4.

45.   Plaintiff is a disabled veteran with a 60% compensatory disability rating from the Veterans Administration, including compensation for herniated disks and spinal stenosis, causing pain, weakness, trembling, and cramps in his chest, back, arms, and legs. Plaintiff receives medication, physical therapy, and massage for these conditions.

46.   Plaintiff has used, needs to use, and intends to use stabilizing arm braces for certain pistols to maintain stability and accuracy for one-handed firing.

47.   Plaintiff is a firearms expert, with almost forty years experience owning, using, buying, selling, making, repairing, and outfitting firearms.

48.   Plaintiff is currently a licensed firearm seller and full-time employee of Sterling Arsenal, L.L.C.; Sterling, Virginia, which is a federal firearms licensed ("FFL") dealer paying a special occupational tax ("SOT") to make and deal in NFA-regulated firearms.

49.   Plaintiff has a collection of more than one-hundred firearms, including twenty-one short-barreled rifles, and two short-barreled shotguns.

50. Plaintiff is active in the firearms community, and he regularly engages in discussions with hundreds to thousands of firearm owners, dealers, lawyers, and experts.

51. Thus, Plaintiff has first-hand, expert knowledge of firearms, firearm accessories, firearm laws, firearm innovation, compliance with the NFA and GCA, and costs to and effects on regulated persons and entities.

**B.  Facts Concerning Firearms, Crimes, and Their Regulation**

52. A firearm with a shorter barrel launches projectiles at a slower velocity, and hence less terminal kinetic energy, than an identical firearm with a longer barrel.

53. A Title I pistol without a brace is more concealable than a Title II SBR made from the same pistol with a fixed stock.

54. Rifles of every kind are known to be used in 2.6% of homicides. FBI, Uniform Crime Report, *Crime in the United States,* 2019 (sum of states).

55. Upon information and belief, SBRs are used in far less than 1% of homicides each year.

56. More people are known to be killed each year with hands, fists, and feet (4.3%) than rifles.

57. The majority of homicides (62.1%) are committed with handguns.

58. Handguns are more concealable than pistols or SBRs.

59. The U.S. Supreme Court has held that handguns are bearable arms in common use, presumptively covered by the Second Amendment. Thus, the test the Supreme Court employed was not based on how common it is for certain guns to be used in crimes, but how commonly they are used for lawful purposes. *New York State Rifle & Pistol Assn., Inc. v. Bruen*, No. 20-843 (June 23, 2022).

60.     The AR-type firearm and its kind are the most popular pistols and rifles in the United States for all lawful purposes, including personal and common defense, hunting, and sport shooting.

61.     Other types of rifles and pistols in common use for lawful purposes include, but are not limited to, AK-type, Heckler and Koch MP5-type and G93-type, Sig Sauer MCX/MPX/556-type, CZ Scorpion, IWI Galil ACE, Ruger 10/22 and PC Charger.

62.     Shotguns in common use for lawful purposes include, but are not limited to, the Mossberg Maverick/500/590/930 series, Remington 870/Versa Max/1100 series, Stoeger Coach Guns, and other break-action, pump action, and semi-automatic shotguns.

63.     Firearms in common use for lawful purposes include the Mossberg Shockwave and Remington Tac 13 and Tac 14. The Mossberg Shockwave was the best-selling pump-action "shotgun" in 2020.[1]

64.     Pistols, carbines and short-barreled rifles are useful in situations where wielding a full-length rifle is cumbersome, such as close quarters, on horseback, or where storage space is limited. Police, military, and civilians commonly use these weapons for these purposes.

65.     Pistols, short-barreled rifles and short-barreled shotguns are suitable for home defense because they can be wielded through tight hallways and doorways, they can be equipped with flashlights and silencers, and they are much more effective in defense than handguns.

---

[1] Sagi, Guy. "Mossberg 590 Shockwave: Top-Selling Pump Shotgun in 2020". American Rifleman; https://www.americanrifleman.org/articles/2021/2/20/mossberg-590-shockwave-top-selling-pump-shotgun-in-2020

66.     Pistols, carbines, short-barreled rifles, and short-barreled shotguns have been in common use for lawful purposes before, during, and long after the ratification of the Second Amendment.

67.     The "carbine" rifle with its short barrel, was developed in the 17th century for cavalry forces.

68.     Currently, the United States Army fields the M4 Carbine with a barrel length of 14.5 inches. The M4 is the fully automatic equivalent of a semi-automatic AR-15 rifle with a 14.5 inch barrel and a pinned and welded muzzle device.

69.     The Giovanni Beretta Folding Stock Snaphaunce Pistol, produced around 1683, could be concealed under a cloak.

70.     Colt's New Model Revolving Rifle was produced from 1855 to 1863 with a barrel length as low as fifteen inches. These were notably used by the Pony Express, a private company.

71.     The Springfield Model 1855 musket was produced in a pistol-carbine version with barrel lengths of ten and twelve inches.

72.     The Smith & Wesson New Model No. 3 Single Action Revolver, produced between 1870 and 1915 with a 6.5-inch barrel, was sometimes made with a detachable shoulder stock.

73.     Winchester Model 1892 rifles were customized into a "mare's leg" model with a shortened barrel of about thirteen inches and a shortened stock.

74.     Marble's Game Getter, produced from 1908 to the present, is a double-barrel gun with a rifle barrel over a smooth-bore shotgun barrel, with a folding stock. The gun was produced in barrel lengths as low as twelve and fifteen inches.

75.   In the 18th and 19th century, fur traders and other persons modified muskets and rifles for personal defense into "blanket guns," so called because they were easy to conceal under blankets or robes.

76.   The British Sea Service Blunderbuss, produced around 1750, was a smoothbore shotgun with a fourteen-inch barrel.

77.   The Wilson Flintlock Blunderbuss with its eleven-inch barrel first appeared in the 16th century and was famously associated with the Pilgrims who landed on Plymouth Rock.

78.   "Coach guns" or "messenger guns" were double-barreled shotguns with shortened barrels used by stagecoach drivers and messengers in the 1860s for personal protection. These guns originated the phrase "riding shotgun" which today means sitting in the passenger seat of an automobile, but in their time, this meant keeping guard while someone else drove the coach.

**C.   Facts Concerning Stabilizing Arm Braces, Blades, and Cheek Saddles**

79.   Braces often, but not always, have straps to more securely fit the brace to a shooter's arm.

80.   AR-type pistols and rifles rely on a buffer and buffer spring to return the bolt carrier group (BCG) into battery, i.e., to fire a subsequent round. The buffer and spring are enclosed within a "receiver extension," commonly called a "buffer tube." Buffer tubes come in varying lengths, e.g., carbine length, rifle length, or personal defense weapon ("PDW") length.

81.   A buffer tube, depending on its design, can also accommodate a rifle stock, a stabilizing arm brace ("brace"), a cheek rest or saddle, or a stabilizing blade.

82.   AR-type pistols are functionally equivalent to, just as concealable as, and equally deadly as SBRs made from the same AR pistols.

11

83. Other types of pistols, such as the B&T APC series and Sig Sauer MPX/MCX series, have internal recoil springs and thus do not require a receiver extension for their operation. These are also functionally equivalent to, just as concealable as, and equally deadly as SBRs made from these pistols.

84. Manufacturers also make cheek saddles or pads that attach to a receiver extension that shooters can put their cheeks on to obtain a good sight picture, but without putting the receiver extension against their shoulders.

85. For all intents and purposes, Defendants treat stabilizing blades, other arm rests, and cheek saddles or pads the same as braces.

86. Many commercially produced braces are adjustable along the receiver extension to accommodate the different lengths and sizes of shooters' arms and hands.

87. One handgun in very common use is the Glock 17 and other Glock models of different sizes and calibers.

88. Recover Tactical, Micro Roni, Flux Defense, and other companies manufacturer stabilizing arm braces for Glock-style handguns and other brands of commonly used handguns.

89. B&T manufactures a chassis for Glock-style pistols, and it separately sells stocks that can be attached to these chassis to make SBRs. B&T does not manufacture braces for these chassis because Defendants issued a determination that these handguns do not weigh enough for a shooter to "need" a brace.

90. Custom Smith Manufacturing also requested a determination from Defendants to make braces for B&T firearms, and Defendants responded negatively.

### E.  Facts Concerning Defendants' Determinations and Rule

91.  In 2012, an FFL submitted the first stabilizing brace to Defendants for evaluation.

92.  Defendants determined that brace, when added to a pistol, did not constitute the making of a Title II firearm. *Letter from ATF #2013–0172* (Nov. 26, 2012).

93.  Subsequent to the 2012 determination, Defendants issued at least seventeen classifications that different stabilizing brace designs did not convert pistols into short-barreled rifles.

94.  On March 5, 2014, Defendants issued a determination that "firing a pistol [equipped with a brace] from the shoulder would *not* cause the pistol to be reclassified." FTB Letter 301737 at 1.

95.  These classifications properly focused their analysis on whether braces could effectively be used to facilitate single-handed firing.

96.  Based on Defendants' determinations, firearm manufacturers and retailers began saying in marketing materials that ATF authorized the use of stabilizing arm braces against the shoulder.

97.  The Rule claims that in 2014, it noticed braces being used to fire weapons from the shoulder and new brace designs that included characteristics common to shoulder stocks.

98.  The *cause* of Defendants' observation was *precisely* their own 2014 determination, and the Rule scurrilously attempts to use the consequences of its own determination as evidence in favor of an opposite determination.

99.  In 2014, Defendants determined that a "foam padded stabilizer tube" attached to a Glock pistol chassis with no cuffs or straps "would result in the manufacture of a 'short-barreled rifle.'"

100. Agency claims it issued an "Open Letter" stating that it made clear to makers and manufacturers that despite their purported intent with respect to the use or design of an accessory, the requirements of the NFA cannot be circumvented. *ATF Open Letter on the Redesign of Stabilizing Braces,* ATF (Jan. 16, 2015). The letter stated that a stabilizing pistol brace "may be attached to a handgun without making a[n] NFA firearm."

101. On December 22, 2015, Defendants issued a determination that SB Tactical's adjustable stabilizing brace installed on a pistol "would not be a 'short-barreled rifle.'" The Rule now regulates that product as making a short-barreled rifle.

102. On March 21, 2017, Defendants issued a letter making it "clear that stabilizing braces are perfectly legal accessories for large handguns or pistols."

103. Defendants' repeated determinations that braces on pistols did not violate the NFA or GCA caused, in Defendants' own words, "demand and production for 'stabilizing braces'" to "take off" in "2017."

104. On December 18, 2020, Defendants published proposed guidance for notice and comment, *Objective Factors for Classifying Weapons with "Stabilizing Braces."*

105. On December 23, 2020, Agency withdrew its proposed guidance.

106. June 10, 2021, Defendants issued a notice of proposed rulemaking, ("NPRM"), *Factoring Criteria for Firearms with Attached 'Stabilizing Braces,'* RIN 1140-AA55 (86 FR 30826). Exhibit 2.

107. January 31, 2023, Defendants issued the final rule, 88 FR 6478. Exhibit 1.

108. Under the Congressional Review Act ("CRA") analysis, the Rule stated it is "projected to have an effect over $100 million on the economy in at least one year of the final rule."

109. The Rule became effective immediately on January 31, 2023, without providing Congress an additional sixty days to consider a joint resolution under the CRA; 5 U.S.C. § 801 et seq.

110. The Rule declared "the rule is immediately effective in that the Department may seek to enforce the NFA's requirements with respect to any new making or new transfer of a weapon with an attached 'stabilizing brace' that constitutes a short-barreled rifle under the NFA."

111. The Rule declared the Agency will use its prosecutorial discretion to allow persons with firearms outfitted with braces until May 31, 2023 (120 days) to comply with the Rule.

112. The Rule claims it does not change the law concerning braced pistols, which it claims were *always* short-barreled rifles.

113. The Rule claims to be an interpretative rule issued pursuant to 5 U.S.C. §553(d)(2).

114. Rule claims, without evidence, that "a majority of these firearms with an attached stabilizing brace are configured as rifles and have a barrel or barrels of less than 16 inches in length."

115. Rule claims that it does not ban braces nor prohibit firearms with an attached brace, regardless of the firearm's classification.

116. The Rule changed the Agency's prior position from permissive interpretations of whether a brace on a pistol could be used as a brace to a restrictive interpretation of whether a braced pistol could be fired from the shoulder.

117. The Rule relies on seven factors in determining whether an accessory constitutes the making of a short-barreled rifle, i.e., designed or redesigned to be fired from the shoulder: (1) rear surface area, (2) weight of the firearm, (3) length of pull, (4) sights or scopes with

eye relief that require shouldering of the firearm in order to be used as designed, (5) necessity for the cycle of operations, (6) marketing and promotional materials, (7) likely use by the community.

118.    Neither the NFA nor the GCA define rifles based on any of these factors.

119.    None of the text or hearing testimony for the NFA or GCA mentions any of the "objective" factors included in the Rule.

120.    While the NPRM applied a point system in determining whether the rear surface area of a firearm is sufficient to categorize the firearm as a rifle, the final Rule determined that *any* rear surface area can potentially make a firearm into a rifle.

121.    Thus, moving away from an objective measure of surface area, the Rule makes the subjective regulatory threshold even more vague and arbitrary.

122.    The Rule concludes that even raised ridges at the rear end of a brace constitute evidence of the intent to design the brace to be fired from the shoulder, because it opines the raised ridges "serve no functional purpose in the design of a pistol brace; however, the ridges [on the back] do provide a non-slip, gripping surface, a feature commonly associated with buttstocks/shoulder stocks as well as firearms designed to be fired from the shoulder." 88 FR 6488.

123.    Defendants' convoluted logic is equivalent to claiming a dog named Rover is a cat because, like a cat, he has fur, four legs, whiskers, and a tail.

124.    The most obvious alternative explanation for such raised ridges is to stand the weapon upright on a floor. Defendants are now making classifications of SBRs based on speculation about what inconsequential features on a brace might allow a user to do.

125. Rather than following the plain text of the statutes, Defendants create felony liability for accessories that merely resemble a buttstock.

126. Plaintiff and millions of other gun owners value the aesthetics of firearms, and they prefer stabilizing arm braces that resemble stocks as opposed to a contraption for the handicapped.

127. The Rule relies on the "length of pull" and weight of braced firearms relative to averages of commonly used rifles.

128. Length of pull is defined by the distance between a shooter's shoulder and the trigger.

129. Defendants estimated that average length of pull for rifles is 13.5 inches, and thus braced pistols with a length of pull longer than that is an SBR.

130. If the length of pull for rifles is normally distributed with a mean of 13.5 inches, then 50 percent of all rifle lengths of pull will be shorter than 13.5 inches and 50 percent will be longer. Thus, a braced pistol with a length of pull greater than 13.5 inches will be shorter than many rifles, and many braced pistols have a longer length-of-pull than many rifles.

131. In a criminal lawsuit, Defendants sought to convict a person for having an unregistered SBR, measuring the length of pull diagonally from the trigger to the butt pad, which exceeded 13.5 inches. The Court observed that the same measurement made horizontally was less than 13.5 inches. The defendant in that case was thereby acquitted.

132. The Rule relies on the same measurement of length of pull from the trigger to the butt pad, but the Rule does not state whether Defendants will measure length of pull diagonally or horizontally, leaving firearm owners without sufficient notice of how to measure length of pull.

133. Despite critical public comments, the Rule's reliance on length of pull expressly rejected that different lengths and girths of people's forearms and fingers would require significantly longer or shorter length of pull than the average rifle.

134. "Eye relief" is a measurement of the usable distance behind the ocular lens of a rifle scope (the near lens). Scopes with low eye relief require shooters to place their eyes very close to the ocular lens for the scope to be effective.

135. The Rule presumes that a scope with limited eye relief mounted on a braced pistol is an indicator of intent to make a short-barreled rifle, because the scope is not usable while using the brace.

136. A shooter need not use a sight or scope while firing, even if those are attached to a gun.

137. A shooter can use a short eye relief scope close to his eye without shouldering a brace.

138. Two identical firearms – one fitted with rifle scope with limited eye relief, and one fitted with a red dot sight with infinite eye relief – could be classified as an SBR and pistol, respectively, while both are equally dangerous and concealable.

139. The Rule countered public comments saying, "The Department disagrees that the method in which a 'stabilizing brace' may be used, in isolated circumstances or by a single individual, is relevant to examining whether a firearm is designed, made, and intended to be fired from the shoulder."

140. Yet the Rule relies on the configuration of scopes or sights that may be used in isolated circumstances by a single individual.

141. Agency states it will not rely on "the way a particular individual uses a firearm equipped with a 'stabilizing arm brace," yet the way such an individual uses the firearm can militate against the inference of intent the Agency seeks to create with the Rule.

142. While the Agency lists purported "objective" factors it will apply in the evaluation of various pistols equipped with braces or other receiver extensions, it is impossible for anyone to know in advance of a determination whether their particular pistol configuration violates the law.

143. The fear of severe punishments for violating the NFA and GCA will keep people from using braced pistols that do not violate those laws.

144. While Defendants properly abandoned the arbitrary, complicated, subjective, and duplicative point-system in the NPRM for determining whether a braced pistol is a short-barreled rifle, the final Rule makes the evaluation of these factors even more nebulous and arbitrary for firearm owners to understand.

145. The Rule relies on Defendants' interpretations of the words "designed" and "intended" in the NFA and GCA. Despite design features demonstrating a brace was designed and can be used as a brace, Defendants prefer to define "designed" to mean that a brace can *conceivably* be used as a stock. Defendants prefer to define "intent" by any features it can conceivably (and speculatively) discern as those enabling firing from the shoulder.

146. Agency has relied on marketing materials in its Bump Stock (RIN 1140-AA52, 83 FR 66514), Definition of a Receiver (RIN 1140-AA54, 86 FR 27720), and Brace rules.

147. Marketing materials do not determine the classification of a firearm under the NFA or GCA. If marketing materials claimed a firearm was a machinegun, when it is not, those claims do not make the firearm into a machinegun. Similarly, marketing a braced pistol as being capable of firing from the shoulder does not make it an SBR.

148.

149. The Rule relies on a few videos and articles by individuals stating their own opinions about how a pistol equipped with a brace could be used like a rifle against the shoulder.

150. The Rule conducted no survey or other research on the propensity of owners of braced pistols to fire the pistol from the shoulder.

151. The Rule claims to be for the purpose of enhancing public safety, yet it does not even attempt to quantify these benefits.

152. The GCA's and Rule's mention of "weapons of war" is mere political dicta and does not reflect the actual characteristics of firearms in common use for lawful purposes; the Nation's historical regulation of firearms has *never* differentiated weapons in common use from weapons used in warfare.

153. The Rule claims short-barreled rifles, and hence braced pistols, are "dangerous and unusual," obviously attempting to shoehorn the Rule into the holding of *Bruen*, which was decided decades after the NFA and GCA were enacted.

154. The Rule relies on two specific incidents (Boulder and Dayton) of firearms outfitted with braces being used in mass shootings from 2012 to 2022.

155. The Rule relies on a few hundred firearms fitted with braces recovered from crime scenes from 2012 to 2022.

156. Nothing at the Rule's cited sources provides any evidence the shooters in Boulder, Dayton, or other recovered weapons involved the shooters putting braced firearms against their shoulders.

157. The Rule estimates from three to seven million braced pistols are in circulation.

158. The Congressional Research Service estimated in an April 19, 2021 report that there could be between ten and forty million firearms using stabilizing arm braces.

159.   Upon information and belief, Defendants' estimates of braces in common use are substantially underestimated.

160.   A braced firearm categorized by the Rule as a rifle that "is designed, made, and intended to be fired from the shoulder," could also be classified as a handgun if it is "designed to be held and fired by the use of a single hand." Agency has adopted the least permissive interpretation of the statutory definitions rather than apply lenity.

161.   The Rule provides no provisions for, and prohibits the unregistered possession of, braces on shotguns or firearms such as Plaintiff's Mossberg Shockwave.

**F.   Facts Concerning the U.S. Homicide Rate, NFA, and GCA.**

162.   From 1904 through 1919, America's homicide rate rose from 1.3 per 100,000 population to about 7.2 per 100,000. Causes included violent labor disputes, range wars, and racial violence.

163.   On January 16, 1919, a sufficient number of states ratified the Eighteenth Amendment which permitted regulation of intoxicating liquors.

164.   On January 17, 2020, the Volstead Act was enacted by Congress, effectively banning the making, sale, and distribution of alcoholic beverages in the United States.

165.   A history provided by the Federal Bureau of Investigation states that from 1924 through 1938, the FBI was at "war" with gangsters profiting from the illegal sale of alcohol. These gangsters literally outgunned an ill-prepared law enforcement community. In Chicago alone, there were more than 1,300 gangs.

166.   As gangsters fought each other for control of the alcohol trade, America's homicide rate rose from about 6.8 per 100,000 population in 1920 to 9.7 in 1933. For perspective, this was nearly double the U.S. homicide rate of 4.9 in 2015.

21

167. On December 5, 1933, a sufficient number of states ratified the Twenty-First Amendment, ending Prohibition, and Congress repealed the Volstead Act.

168. In 1934, Congress enacted the National Firearms Act, largely adopting a draft written by the Department of Justice. The draft did not include regulation of short-barreled rifles. The proposed regulation of handguns was dropped because Congress found such a provision would be highly unpopular.

169. Congress added short-barreled rifles to its NFA regulation based on one Congressman's mistaken belief that doing so would protect rifle hunters in his state. In fact, adding the SBR provision put his constituents at greater risk of legal liability.

170. Nothing in NFA hearing testimony indicates short-barreled rifles are dangerous or unusual, that they are "weapons of war," that they have been commonly used in crimes, that they are easily concealed, or that they have no lawful uses.

171. In NFA hearings, Defendants and congressmen made false, conclusory claims that short-barreled shotguns were dangerous and that only criminals would want to possess them.

172. Defendants testified in NFA hearings that they did not expect criminals to pay the NFA tax and register their regulated firearms, and they would "get" the criminals not for violent crimes, but for failure to pay the tax.

173. Defendants testified in NFA hearings that they never intended to enforce the NFA against law-abiding citizens.

174. From 1931 to 1945, the homicide rate in the U.S. fell below pre-Prohibition levels to about 4.3 per 100,000 in 1958.

175. From 1958 to 1968, the homicide rate rose to about 6.9 per 100,000, largely caused by the trafficking of illegal drugs.

176. On October 22, 1968, the president signed the Gun Control Act of 1968, which was largely motivated by the assassinations of John F. Kennedy, Robert Kennedy, and Martin Luther King, Jr., none of which were committed with NFA-regulated firearms.

177. Despite the GCA, homicide rates continued to rise to a peak of 10.2 per 100,000 in 1980, but falling to about 7.9 in 1984. The homicide rate rose again to 9.4 by 1990 before falling at or near 5.0 from 2009 to 2019.

178. The U.S. incarceration rate rose from 310 per 100,000 in 1980 to 1,000 in 2008, falling to 810 by 2019.

179. Thus, the lengthy downward trend in homicide rates from 1980 to the present was not caused by gun control laws, but by incarcerating criminals.

180. There are millions of lawfully registered short-barreled rifles and short-barreled shotguns in common use for lawful purposes. Congress did not ban these weapons, but made them "legal for a price," indicating Congress did not really believe these firearms were dangerous.

### G. Facts Concerning the Rule's Cost-Benefit Analysis and Other Regulatory Analysis

181. Defendants' own estimates show that only 1.16% of rifles in circulation (including SBRs) are found in traces.

182. Defendant's estimates of about 51 million firearms in circulation is only 11.7% of the common estimate of about 400 million guns. Adjusting Defendants' gun count, only 0.147% of rifles in circulation are found in traces, and SBRs are a small fraction of that.

183. The Rule did not monetize or quantify the rule benefits, nor did the Rule state why Defendants could not do so.

184. Based on Plaintiff's expertise in conducting cost-benefit analysis for agency rulemaking, Defendants could have quantified and monetized benefits, but refused to do so.

185. In Plaintiff's expert opinion, such a quantification would reveal the Rule has almost no benefits because only a miniscule percentage of braced pistols are used in crimes and, in any event, the costs are substantially higher than the benefits.

186. Based on Plaintiff's public comment for *Definition of a Frame or Receiver* Rule (RIN 1140-AA54, 86 FR 27720), Defendants withdrew their reliance on the existence of a negative externality (a market failure) from the criminal use of unmarked firearms.

187. Similarly, the NPRM for the Brace Rule relied on the existence of a negative externality, yet the Final Rule withdrew its reliance on such an economic effect. Consequently, the Rule provides no theoretical or empirical support that the benefits of the rule exceed the costs.

188. The Rule claimed unquantified benefits: (1) To prevent manufacturers and individuals from circumventing the requirements of the NFA, (2) to enhance public safety by reducing the criminal use of NFA firearms, which are easily concealable from the public and first responders.

189. The Rule's declaration that braced pistols are short-barreled rifles begs the question that braced pistols circumvent the NFA.

190. Few, if any, persons intending to commit violent crimes with braced firearms will register their firearms as SBRs, nor will they be deterred by the NFA, GCA, or the Rule from making and using braced pistols or SBRs to commit such crimes.

191.  The Rule estimated the affected population to be five manufacturers of braces; 3,881 manufacturers with pistols outfitted with braces; 13,210 dealers with pistols outfitted with braces; and 1.4 million firearm owners.

192.  The Rule estimated societal costs of $266.9 million at a 7 percent discount rate.

193.  The Rule estimated government costs of $3.3 million.

194.  The Rule excluded any additional costs for more law enforcement personnel or prosecutions of millions of braced firearms suddenly becoming unlawful SBRs.

195.  The Rule calculated a "high" cost, based on seven million braced firearms, of $581.9 million.

196.  Based on estimates of between 13 and 40 million braced firearms in common use, the costs estimated by the Rule would rise to an annualized $1-3 billion dollars, not including other under- and un-estimated costs.

197.  The Final Regulatory Impact Analysis ("RIA"), Exhibit 3, rebuts comments claiming a much higher number of braced pistols by reporting there were only 32.4 million pistols manufactured between 2013 and 2020, and those were obviously not all equipped with braces.

198.  Yet Defendants ignored that people could make braced pistols from receivers purchased *before* 2013 or privately-made receivers *after* 2013. The Rule does not include in its estimate the number of bare or complete receivers transferred as "Other," which could be made into rifles or pistols.

199.  The Rule contradicts itself first by claiming a rapid rise in the number of braced pistols, while simultaneously low-balling the number for its cost estimates.

200. Even if Defendants' estimates were well-founded, Defendants did not vary their assumptions to estimate costs with numbers of braced pistols above seven million.

201. The Rule's estimates rely on conclusory claims by unidentified "subject matter experts" and "ATF field offices," a common hand-waving tactic Defendants used in the *Receiver* and *Bump Stock* rules.

202. The Rule relies on a low-ball estimate that FFLs have an average of three to seven braced pistols in inventory. But the estimate does not identify or produce sources or reports for these estimates.

203. The Rule does not include costs for the labor hours of the paperwork burdens.

204. The Rule relies on the specious assumption that the "disposal of bump-stock devices, which was an option under Final Rule 2018R-22F" provides meaningful estimates of disposal of braced firearms because "the demand for firearms with an attached 'stabilizing brace' would have been similar to the demand for bump-stock-type-devices since the demand for both items stems from the desire to circumvent the NFA."

205. In reality, ownership of braced pistols is orders of magnitude greater than ownership of bump-stock type devices, and the Agency speculates that similar motives result in similar outcomes.

206. Defendants claim that although "some State laws incorporate Federal law for purposes of banning or otherwise regulating short-barreled rifles, this rule does not purport to preempt any State laws, nor does it require any State to change its laws.

207. Defendants were required by statutes and executive orders to examine the *economic effects* on State, local, and tribal governments, not merely address the narrow issue of preemption.

Because several states ban possession of SBRs, but not pistols, the Rule will certainly increase the economic burdens of states, localities, and tribes.

208. The Rule acknowledges many public commenters taking issue with the Agency's estimate of costs, but Defendants only partially agreed.

209. The Rule acknowledges many public commenters taking issue with the Agency's estimate of benefits, but Defendants made only conclusory statements that the NFA and Defendants' enforcement enhances public safety. Defendants did not and can not provide any evidence the Rule, NFA, or GCA enhances public safety.

210. Plaintiff's analysis determines that the rise in homicides prior to the enactment of the NFA was caused by enactment of the Eighteenth Amendment and subsequent Volstead Act, increasing the profits from illegal production and distribution of alcoholic beverages.

211. Plaintiff's analysis determines that the repeal of the Eighteenth Amendment and the Volstead Act caused the sharp decline in homicides in the U.S., beginning before the enactment of the NFA and not because of the NFA.

212. Plaintiff's analysis determines that the Gun Control Act had little to no marginal effect on homicide rates in the U.S., the homicide rate rose after enactment of the GCA, and it remained above the 1968 level until 1997. The U.S. homicide rate began falling in 1991 mainly because of tougher anti-crime laws and a sharp rise in incarcerations.

213. Plaintiff's analysis of homicides indicates murders are mostly gang-related and heavily concentrated among Blacks and Hispanics, in less than five percent of U.S. counties, and in only a handful of neighborhoods within those counties. The majority of U.S. counties have zero homicides per year.

214. Based on Plaintiff's expert knowledge of firearms and economics, the costs to firearm dealers would be enormous, effectively ending all commerce in braced pistols and substantially reducing demand for pistols without braces.

215. Plaintiff has personal knowledge that the profit margin on firearms for FFL dealers is very low.

216. Thus, the Rule puts all small firearm dealers at substantial risk of shutting down.

217. Defendants are attempting to obtain a reduction in gun ownership by attacking the profitability of and harassing gun manufacturers, distributors, retailers, and gun owners.

218. Defendants did not alter their prior determinations based on any new and material information leading it to conclude its prior classifications were incorrect.

219. Instead, Defendants altered their classifications based on their preferences for Democratic Party political positions on firearms, enabled by the vast preponderance of Democrat employees in the Department of Justice and the BATFE.

220. Under the Unfunded Mandates Reform Act of 1995 ("UMRA"), the Rule determined it would not have aggregate annual effects of $100 million or more on state, local, or tribal governments, but it would impose a mandate on the private sector in excess of $100 million annually.

221. The Rule did not consider deferring action on braced pistols to Congress, state, local, or tribal regulation.

222. The Rule rejected the *status quo ante* and "grandfathering" alternatives based on its pre-determined position that braced pistols are SBRs. Defendants erroneously and repeatedly assign $0 in costs and benefits to the *status quo ante* without examining the advantages and disadvantages of that alternative relative to the Rule.

223. The Rule did not explain whether its "forbearance" of NFA taxes for registration of braced pistols could later be collected by the Agency, and it did not include later collection within its costs.

224. The Rule rejected specific, quantifiable standards "since it does not account for non-quantifiable features," but without considering the ambiguity of non-quantifiable features.

225. The Rule rejected publishing guidance documents because it is "not as clear as amended regulations and non-FFLs may be less aware of guidance and hence continuing selling firearms outside the purview of the NFA." Defendants' response is nonsense because every other federal agency issues guidance documents for which the public and regulated industry are put on notice in the federal register. But as an interpretative rule, Defendant's Rule is little more than guidance.

226. The Rule rejected the NPRM's weighted criteria as "more confusing to individuals and FFLs in terms of compliance," yet it adopted an even more vague, ambiguous, and subjective standard of non-quantifiable factors.

227. The Rule rejected an alternative to buy back braced firearms because it "would be costly and administratively burdensome" for the government, and "the Department has provided other options." Other options include firearm owners destroying or surrendering their valuable property.

228. The Rule rejected exemption from regulation for persons providing proof of disability or other "need" for a stabilizing brace because it "would require medical judgments that are beyond the scope of ATF's expertise." Nothing prevents Defendants from hiring qualified medical professionals to review the findings of a firearm owner's licensed physician.

229.   While the Rule stated the Agency would issue a small business compliance guide, the Agency has not done so within a sufficient period of time to help small businesses understand the Rule and to mitigate damages caused by the Rule to those businesses.

**I.**   **Facts Concerning Transportation of Title II Firearms Across State Lines**

230.   Plaintiff owns twenty-three Title II SBRs and SBSs.

231.   The Gun Control Act prohibits the transportation of short-barreled rifles, short-barreled shotguns, any other weapons, destructive devices, and machineguns across state lines without approval by Defendants.

232.   To receive approval to carry Title II firearms across state lines, Plaintiff filed ATF Form 5320.20 ("Form 20").

233.   Approval of a Form 20 takes more than six weeks.

234.   The closest outdoor range to Plaintiff's home with target distances beyond 100 yards is in West Virginia, sixty-four miles and a 1.5-hour drive away.

235.   Virginia, all its bordering states, and at least 36 other states allow Title II firearms.

236.   Plaintiff has brought Title II firearms to another state after receiving an approved Form 20.

237.   Plaintiff's Form 20s expire after one year, requiring him to re-submit the form annually.

238.   Form 20 provides space for only three firearms, and Defendants require separate Form 20s for additional firearms.

239.   Plaintiff would have to file eight Form 20s each year to cover all his Title II firearms, and even more if he registers his braced pistols.

240.   Plaintiff would carry Title II firearms to other states for self-defense and sporting purposes but for provisions of the GCA and Defendants' regulations concerning transporting Title II firearms across state lines.

241.   Plaintiff's exposure to the threat of deadly force and his intention to use Title II firearms for lawful purposes do not vanish once he crosses his state's border into another state.

**J.   Injuries to Plaintiff from the Rule, NFA, and GCA.**

242.   Defendants state that, "This rule would affect all individuals who currently own a firearm with an attached 'stabilizing brace' that is subject to regulation under the NFA." RIA at 25.

243.   Plaintiff owns at least five braced pistols affected by the Rule.

244.   Plaintiff owns twenty-one Title I firearms to which he could attach a stabilizing arm brace.

245.   Plaintiff was constructing a privately-made braced AR pistol in caliber 300 Blackout, which he ceased making when Defendants promulgated a short-lived guidance proposal, 85 FR 82516 (December 18, 2020). That proposal was withdrawn on December 31, 2020.

246.   Plaintiff would immediately make more SBRs and short-barreled shotguns ("SBS") but for the NFA and GCA.

247.   Plaintiff would immediately make more braced firearms but for the NFA, GCA, and the Rule.

248.   Because of the Rule, Plaintiff cannot transport any of his braced firearms across state lines without an approved Application to Transport Interstate or to Temporarily Export Certain NFA Firearms (ATF Form 5320.20, a.k.a. "Form 20").

249.   Because of the Rule, it is a felony violation of the NFA and GCA to sell or otherwise transfer his braced pistols without filing an Application for Tax Paid Transfer and Registration of Firearm (ATF Form 5320.4, a.k.a. "Form 4").

250.   Plaintiff made his first three SBRs and his first SBS on August 17, 2016.

251.   Plaintiff uses braced firearms, SBRs, and SBSs for home defense, in particular a B&T APC 45 SBR and a Remington 870 SBS. Plaintiff also uses a Title I Mossberg Shockwave firing 12-gauge shotgun shells.

252. On or about November 17, 2019, Plaintiff purchased a Q Honey Badger pistol, originally and permanently fitted with a stabilizing arm brace.

253. Plaintiff never had any intention to make his Honey Badger pistol into an SBR because Agency classifications at the time he purchased it allowed him to keep and use it as a braced pistol, including using the brace against his shoulder.

254. On or about October 9, 2020, Defendants issued a Cease-and-Desist Order to Q, L.L.C., saying that Defendants determined the Q Honey Badger pistol in its current configuration is an SBR.

255. Shortly thereafter, Defendants suspended this determination for sixty days.

256. Q, L.L.C. stated publicly its belief that the suspension was to postpone the issue past the 2020 presidential election.

257. Because of Defendants' determination, Q, L.L.C. ceased production of its Honey Badger pistol with brace, and it now produces a pistol with a short buffer tube and no brace.

258. The Rule explicitly considers the Q Honey Badger pistol with its stabilizing arm brace to be an SBR. *See* 88 FR 6493—4.

259. Neither Q, L.L.C. nor any other company currently manufactures and sells a product to make Plaintiff's firearm into a pistol without a brace. Thus, Plaintiff's only options are to make an SBR, surrender, or destroy his Honey Badger.

260. Plaintiff cannot sell his Honey Badger without the buyer paying the $200 NFA tax, submitting a Form 4, and waiting approximately 9 to 12 months. This greatly diminishes the market value of Plaintiff's firearm.

261. If Q, L.L.C. later makes a short buffer tube and recoil assembly, Plaintiff will incur additional costs up to $375 to convert his Honey Badger to a pistol without a brace or to buy a stock.

262. If Plaintiff makes an SBR from his Honey Badger pistol, he will incur costs of $65 to $85 for NFA engraving, must provide a photograph and fingerprints, and he must register his pistol on the NFA Registry.

263. The resale value of Plaintiff's Q Honey Badger pistol was approximately $4500 prior to the Rule, which he would lose if he is forced to surrender or destroy his pistol.

264. All of Plaintiff's Title II firearms are owned by a trust ("NFA Trust") Plaintiff explicitly set up for his NFA-regulated firearms on August 15, 2015.

265. On the advice of his attorney, Plaintiff placed no non-NFA firearms into his NFA Trust to prevent Defendants from obtaining a list of Plaintiff's Title I firearms if he were required to provide them a schedule of his Title II firearms.

266. Defendants know it is standard practice for the vast majority of firearm trust attorneys to not refer to a schedule of Title II firearms in the trust, because Defendants will demand any document mentioned or referred to in the trust with each Form 1 or Form 4.

267. Defendants know the vast majority of firearm trust attorneys advise their clients to not put Title I firearms on the schedule of Title II firearms owned by the trust.

268. Defendants know the vast majority of makers or transferees of Title II firearms do not include a schedule of trust firearms with their Form 1 or Form 4 applications.

269. Defendants do not need a schedule of Title II firearms owned by the trust for each new registration because Defendants already have that information in the NFA Registry.

270.  On February 6, 2023, Plaintiff attempted to register his Q Honey Badger to his NFA Trust by an electronic Form 1 under the Rule's tax exemption. Defendants demanded evidence the NFA Trust owned the braced firearm before the January 31, 2023 effective date.

271.  Defendants consider sufficient evidence to "generally include the signed, dated, and notarized terms of the trust or trust schedules that list or provide a description of the property held in trust."

272.  Yet Plaintiff could not have known of this requirement until after the Rule was published in the Federal Register on January 31, 2023. Thus, Plaintiff is now forever barred from a tax-exempt registration of his Honey Badger pistol, obtained years prior to the Rule, as property of his NFA Trust.

273.  Even if Plaintiff knew he was required to list his braced pistols on a notarized schedule in his NFA Trust, the Rule unlawfully required Plaintiff to pay costs of notarization and take obligatory actions prior to its effective date.

274.  Plaintiff would have to pay a $200 tax to transfer his Honey Badger pistol to his NFA Trust.

275.  Agency's Paperwork Reduction Act estimates filing an ATF Form 1 averages 4.0 hours. At Plaintiff's regular rate of pay, the opportunity cost of his time would be about $383.00.

276.  Plaintiff owns a Ruger 10/22 pistol fitted with a Sig Sauer PCB cuff-type folding brace.

277.  Plaintiff registered his Ruger 10/22 pistol as an SBR on April 26, 2019, but before making the SBR, Plaintiff decided to keep a brace on it for one-handed use. Plaintiff requested and received an NFA tax refund from Defendants.

278.  Plaintiff owns a Mossberg Shockwave firearm on which he mounted an adjustable SB Tactical SBA 3 cuff-type stabilizing arm brace, remaining more than 26 inches in length.

279.   Plaintiff removed the stabilizing arm brace from the Shockwave when he became aware from public discussion that Agency considered it a short-barreled shotgun with a brace replacing the "bird's head" grip.

280.   Plaintiff owns a Gearhead Works Mod 1c Tailhook, which is a counterbalance type brace, which he bought expressly to add to an AR pistol. The Mod 1c has minimal surface area.

281.   The Rule would force Plaintiff to either remove braces from his pistols, to register them as SBRs, surrender, or destroy them. Surrender or destruction would cost Plaintiff thousands of dollars of the value of his firearms.

282.   Registration of Plaintiff's firearms injures Plaintiff by forcing him to provide information about himself and his firearms to the federal government, with which it could later confiscate or regulate the firearms. This violates Plaintiff's rights under the Fourth Amendment.

**K.   Facts Demonstrating Strong Political Motivations for the Rule**

283.   President Barack Obama, a Democrat, issued so many gun control executive actions, proposed bills and regulations, and made public statements that Americans rushed to buy firearms in advance of regulation. The gun community mocked him as "Gun Salesman of the Year."

284.   President Donald J. Trump, a Republican, and his appointed officers and judges, were generally favorable to gun rights, with the notable exception of the *Bump Stock* rule.

285.   President Joseph Biden, a Democrat, took office on January 20, 2021, and thereafter he appointed a Democrat attorney general, U.S. attorneys, and Director of ATF.

286.   On April 8, 2021, President Biden made "President's Remarks on Gun Violence Prevention Efforts, 2021 Daily Comp. Pres. Doc. 298, at 3, "to treat pistols modified with stabilizing

36

braces" as "subject to the National Firearms Act," This "change," the President said, would require owners of pistols equipped with a stabilizing brace to "pay a $200 fee and submit their name and other identifying information to the Justice Department" or face criminal penalties. *Id.* The President's express aim was to act "without having to go through Congress." *Id.* at 2.

287.  President Biden, and Democrats more generally, have a broad and lengthy history of regulating or banning practically every firearm in existence, or otherwise increasing the costs and burdens to firearm owners and dealers to infringe gun rights in violation of the Second Amendment.

288.  In a fit of pique response to U.S. Supreme Court decisions favoring gun rights, President Biden, the Democratic controlled Congress, and Democrat governors and legislatures nationwide have instituted hundreds of new, unlawful, gun control laws and regulations seeking to blunt the impact of these legal precedents.

289.  From publicly-available information, Plaintiff has learned that the overwhelming preponderance of federal employees of the Department of Justice are Democrats. These proportions are so far above what we would observe from a random selection of employees, that a researcher could easily reject the null hypothesis of "No Political Discrimination," and conclude that Defendants hire, retain, and promote employees based on political affiliation, in violation of 5 U.S.C. § 2301—2302. This means that DOJ and BATFE employees have sought to enact through regulation what the Democratic Party could not obtain through legislation in a divided Congress.

## CLAIM ONE

**Violations of the Administrative Procedure Act; the Small Business Regulatory Enforcement Fairness Act, the Congressional Review Act, and the Unfunded Mandates Reform Act.**

290. Plaintiff incorporates herein by reference the facts in the preceding paragraphs and all exhibits to this *Complaint*.

291. From 2012 until late 2020, Defendants issued repeated and insistent determinations that stabilizing arm braces do not make pistols into short-barreled rifles.

292. Defendants' determinations created substantial reliance interests for Plaintiff in making and purchasing braces and pistols with braces, costing him thousands of dollars.

293. Under a politically-motivated presidential directive, and without any new or material information, Defendants promulgated a Notice of Proposed Rulemaking on June 10, 2021 to reclassify pistols with braces as SBRs.

294. On January 31, 2023, Defendants promulgated *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* RIN 1140-AA55, that was effective immediately.

295. As an interpretative rule, Defendants exceeded their statutory authority by imposing legal obligations with criminal penalties.

296. As a legislative rule, Defendants violated numerous statutes described below.

297. The Rule violates the Congressional Review Act (CRA) by not having an effective date 60 days after publication of the final rule.

298. The Rule's provision of not enforcing the Rule for 60 days does not comply with the CRA.

299. The Rule relies on factors that are arbitrary and capricious, and that Congress did not intend for the Agency to consider in determining whether a gun is a short-barreled rifle or shotgun.

300. The Rule fails to consider factors Congress deemed important.

301. Agency exceeded its statutory authority in regulating stabilizing arm braces, which are firearm accessories.

302. Guns with stabilizing braces are not designed or intended to be fired from the shoulder, notwithstanding even widespread use of braces against the shoulder.

303. Despite claiming to rely on "objective" factors, the Agency's potential classifications for millions of devices and uses remains idiosyncratic, subjective, arbitrary, and capricious, and beyond the capacity of ordinary persons to understand what behavior violates the law.

304. The Rule violates the Small Business Regulatory Enforcement Fairness Act, 5 U.S.C. § 601 et seq., by failing to adequately analyze rule costs and benefits and other rule effects on small businesses.

305. The Rule is void for vagueness because numerous terms in the Rule cannot be understood by reasonably intelligent people to know what the law requires or forbids.

306. The Rule of Lenity militates against a restrictive definition of braced pistols as a rifle in favor of a permissive definition of a pistol.

307. The Rule failed to adequately identify a significant problem requiring regulation.

308. The Rule failed to explain why regulation at the Federal level is necessary.

309. The Rule failed to monetize or quantify costs and benefits or otherwise explain why those could not be monetized, even though doing so is a straightforward economic exercise.

310. The Rule's benefits are negligible, and in any event are far outweighed by its costs.

311. The Rule failed to provide meaningful responses to public comments.

312. The Rule failed to adequately address alternative regulatory approaches.

313.   The Rule failed to completely analyze the *status quo ante* and explain why existing laws, rules, regulations, criminal and tort liability were inadequate for preventing the harm and economic inefficiency the Rule identified.

314.   The Rule failed to consider deferring action to Congress, States, Tribes, or localities, and the Rule did not explain why doing so was not feasible.

315.   The Rule failed to examine its effects on economic growth, innovation, competition, and job creation.

316.   The Rule made unsupported assumptions greatly in its own favor and without seeking more reliable information from the public through an Advance Notice of Proposed Rulemaking.

317.   The Rule failed to show the results of sensitivity analyses from changing rule assumptions.

318.   The Rule's definitions are not permissible constructions of the relevant statutes.

319.   Defendants acted on a policy issue of great economic and political significance providing a reason to hesitate before concluding that Congress meant to confer such authority.

320.   The Rule's switch of its approach in the NPRM in determining whether a braced firearm could be used as a brace to the Rule's determination whether a braced firearm could be used as a stock represents a profound change to the proposed rule the public had no opportunity to comment on, and thus the Rule is not a logical outgrowth of the NPRM.

321.   For all the reasons stated above, the rule must be set aside under 5 U.S.C. § 706 because it is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law; contrary to constitutional right, power, privilege, and immunity; in excess of statutory jurisdiction, authority, or limitations, and short of statutory right; without observance of procedure required by law; and unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

322.   Plaintiff has no other remedies under the law.

323.   Plaintiff suffers imminent and ongoing harm that is irreparable, concrete and particularized.

324.   Plaintiff's injuries are caused by the NFA, GCA, the Rule, and Defendants' classifications.

325.   Plaintiff's injuries would be fully redressed by granting the requested the relief.

## CLAIM TWO

### Violations of the Second Amendment

326.   Plaintiff incorporates herein by reference the facts in the preceding paragraphs and all exhibits to this *Complaint*.

327.   Congress does not possess police powers, and therefore it has limited authority to enact laws to prevent crime in the several states.

328.   Defendants enforce provisions of the National Firearms Act and Gun Control Act regulating, taxing, possessing, making, and transferring short-barreled rifles (SBRs) and short-barreled shotguns (SBSs).

329.   The United States Supreme Court has held that the Second Amendment presumptively protects keeping and bearing all bearable arms in common use for lawful purposes, including those not in existence when the Second Amendment was ratified. *New York State Rifle and Pistol Association v. Bruen*, __ U.S. __, Case No. 20-843, slip op. (June 23, 2022).

330.   Short-barreled rifles and short-barreled shotguns are bearable arms that were in common use for lawful purposes before, during, and long after the Second Amendment was ratified.

331.   The NFA and GCA, enacted long after the Second Amendment, are not part of the Nation's long history of firearm regulation.

41

332. Neither Congress nor Defendants may declare weapons "dangerous and unusual," when their objective characteristics and widespread ownership demonstrate they are either not dangerous or not unusual.

333. If Congress or Defendants could declare firearms "dangerous and unusual" by legislative or executive fiat, then any firearm could be deprived protection of the Second Amendment with conclusory legislation or rulemaking.

334. Braced pistols, SBRs, and SBSs are neither dangerous nor unusual.

335. By Defendants' own estimates, SBRs (including braced pistols) are almost never used in crimes.

336. Braced pistols, SBRs and SBSs have legitimate, non-dangerous purposes of wielding firearms inside homes and other structures, on horseback, in cars, and in other confined spaces.

337. The NFA, GCA, and Rule are unconstitutionally overbroad, regulating hundreds of millions of firearms owned by a hundred million people based on the criminal acts of a minuscule proportion of the population. Plaintiff hereby seeks to extend, modify, and reverse existing law, or to establish new law, by expanding the overbreadth doctrine beyond the First Amendment context.

338. For these reasons, this Court should declare that the NFA, GCA, and Rule violate the Second Amendment of the United States Constitution with respect to SBRs and SBSs.

339. Plaintiff has no other remedies under the law.

340. Plaintiff suffers imminent and ongoing harm that is irreparable, concrete and particularized.

341. Plaintiff's injuries are caused by the NFA, GCA, the Rule, and Defendants' classifications.

342. Plaintiff's injuries would be fully redressed by granting the requested the relief.

## CLAIM THREE

### The Gun Control Act's Transportation Provision Violates the Second Amendment

343.   Plaintiff incorporates herein by reference the facts in the preceding paragraphs and all exhibits to this *Complaint*.

344.   A person's right to protect his life and the lives of others does not end at his home state's boundaries.

345.   Absent state law prohibiting short-barreled rifles and shotguns, Federal law may not prevent persons carrying bearable arms across state lines nor require permission to do so.

346.   Guns used for personal defense, sport shooting, or hunting are not traded in commerce merely because they are transported across state lines, thus Congress and Defendants are prohibited by the Tenth Amendment from regulating their transportation.

347.   Consequently, the Gun Control Act's regulation of transportation of short-barreled rifles, short-barreled shotguns, any other weapons, and machineguns across state lines must be held unlawful and set aside.

348.   Plaintiff has no other remedies under the law.

349.   Plaintiff suffers imminent and ongoing harm that is irreparable, concrete and particularized.

350.   Plaintiff's injuries are caused by the NFA, GCA, the Rule, and Defendants' determinations.

351.   Plaintiff's injuries would be fully redressed by granting the requested the relief.

## CLAIM FOUR

### Violations of the Fourth Amendment

352.   Plaintiff incorporates herein by reference the facts in the preceding paragraphs and all exhibits to this *Complaint*.

353. Plaintiff has a right under the Fourth Amendment to be free from unreasonable searches and seizures.

354. The Rule, GCA and NFA require Plaintiff to provide Defendants – without a warrant or probable cause – his   name, address, fingerprints, photograph, and his firearm's manufacturer, model, serial number, caliber, and Trust information.

355. The Second Amendment is not a second-class right.

356. No other fundamental, enumerated right is regulated with such intrusive information requirements.

357. Defendants can use such information to prosecute Plaintiff or to confiscate his lawfully obtained and used property.

358. The U.S. Supreme Court has held that criminals cannot be punished for failure to register their NFA-regulated firearms because that would violate the Fifth Amendment privilege against self-incrimination. *Haynes v. United States*, 390 U.S. 85 (1968).

359. Thus, the Rule, NFA, and GCA searches and seizes information solely from law-abiding citizens using firearms for lawful purposes.

360. Plaintiff has no other remedies under the law.

361. Plaintiff suffers imminent and ongoing harm that is irreparable, concrete and particularized.

362. Plaintiff's injuries to his Fourth Amendment rights are caused by the NFA, GCA, the Rule, and Defendants' determinations.

363. Plaintiff's injuries would be fully redressed by granting the requested the relief.

## CLAIM FIVE

### Violations of the APA and Second Amendment

364.    Plaintiff incorporates herein by reference the facts in the preceding paragraphs and all exhibits to this *Complaint.*

365.    With exceptions not present here, Section 922(r) of Title 18, U.S. Code, makes it unlawful for any person to "assemble" from imported parts any semiautomatic rifle or shotgun which is identical to any rifle or shotgun prohibited from importation under section 925(d)(3) as not being particularly suitable for or readily adaptable to sporting purposes.

366.    With exceptions not present here, Section Part 178.30, Title 27, Code of Federal Regulations states that "No person shall assemble a semiautomatic rifle or any shotgun using more than ten of the imported parts listed in paragraph (c) of this section if the assembled firearm is prohibited from importation under section 925(d)(3) as not being particularly suitable for or readily adaptable to sporting purposes."

367.    The term "imported parts" includes a list of parts under section 478.39(c).

368.    The Rule and Defendants' determinations interpret the provisions of 18 U.S.C. § 922(r) to affect persons who buy imported pistols made with foreign parts who then assemble such pistols into braced pistols and SBRs. This is because Defendants do not consider SBRs to be suitable for or readily adaptable to sporting purposes.

369.    Such an interpretation would require Plaintiff and millions of other owners of such foreign made pistols, such as B&T, CZ, and H&K firearms to replace foreign made parts in their pistols with American-made parts before making an SBR.

370.    According to Defendants, any person making a braced pistol or an SBR from an imported pistol without replacement of foreign-made parts is already in violation of 18 U.S.C. §922(r), and such violation can not be subsequently cured by later part replacement.

371.    Thus, Defendants' Rule and interpretations have turned millions of Americans into instant felons.

372.    Because the market for certain foreign-made pistols such as B&T are rather thin, there exists few to no American manufacturers of replacement parts to comply with Defendants' interpretation.

373.    For example, there are no domestic manufacturers of B&T magazines, which comprise three parts among the list in 27 C.F.R. § 478.39(c).

374.    Replacing foreign with American-made parts is extremely costly, in the hundreds or thousands of dollars per firearm.

375.    Some foreign-made pistols can not be made to comply with Defendants' interpretation of 922(r).

376.    Foreign-made SBRs, such as the B&T APC-9 and USW A1, and the H&K MP5 are routinely used for sporting purposes, such as competitions organized by the National Rifle Association (NRA), United States Practical Shooting Association (USPSA), the International Defensive Pistol Association (IDPA), and the National Shooting Sports Foundation (NSSF).

377.    The imported parts regulated by 922(r) are generally described in § 478.39(c), but Defendants provide specific parts lists for a limited number of guns.

378.    Defendants have never published the § 478.39 for Plaintiff's foreign-made pistols, leaving Plaintiff in complete doubt as to whether his firearms could comply with 922(r).

379.    Because Plaintiff owns numerous foreign-made pistols converted to SBRs, Defendants' Rule and interpretation of 18 U.S.C. § 922(r) will force Plaintiff to destroy or surrender

any foreign-made pistols he ever bought or added a brace to or made an SBR, as well as forfeiting his NFA tax payments.

380.    Defendants' interpretation of "assembled" in 18 U.S.C. §922(r) is not a permissible construction of the statute, in that the statute applies *only* to importers of foreign-made parts making rifles, and not to end-users who convert lawfully imported pistols into SBRs.

381.    If Defendants' interpretation is correct, Section 922(r) of Title 18 violates the Second Amendment in that Plaintiff's foreign-made pistols with braces or converted to SBRs are bearable arms in common use for lawful purposes.

382.    Plaintiff has no other remedies under the law.

383.    Plaintiff suffers imminent and ongoing harm that is irreparable, concrete and particularized.

384.    Plaintiff's injuries to his Second Amendment rights are caused by the NFA, GCA, the Rule, and Defendants' determinations.

385.    Plaintiff's injuries would be fully redressed by granting the requested the relief.

## CLAIM SIX

### Violations of the Fifth Amendment

386.    Plaintiff incorporates herein by reference the facts in the preceding paragraphs and all exhibits to this *Complaint*.

387.    The Rule, NFA, and GCA cause Plaintiff to register, surrender, or destroy his valuable personal property, costing thousands of dollars.

388.    The Rule, NFA, GCA, and Defendants' determinations have substantially reduced the market value or altogether prohibited the sale of Plaintiff's valuable property.

389.    The Rule, NFA, GCA, and Defendants' determinations violate Plaintiff's right against self-incrimination protected by the Fifth Amendment.

390.   Based upon public information and belief, Defendants' agencies (like almost all agencies) are deliberately packed with Democrats in a lengthy campaign of blatant political discrimination stretching back decades.

391.   Defendants' political discrimination in the hiring, retention, and promotion favoring Democrats and disfavoring Republicans deprives Plaintiff and other gun owners of due process and implicates serious separation of powers concerns.

392.   Plaintiff has an implied cause of action under 5 U.S.C. § 2301-2302 to challenge Defendants' political discrimination because Congress intended to ban political discrimination in federal employment; Plaintiff is one of the class for whose especial benefit the Civil Service Reform Act (CSRA) was enacted to provide a professional, apolitical civil service; there are no implicit or explicit indications by Congress to deny such a remedy; a remedy against political discrimination is consistent with the underlying purpose of the CSRA; and the action is not traditionally relegated to state law.

393.   Plaintiff has no other remedies under the law.

394.   Plaintiff suffers imminent and ongoing harm that is irreparable, concrete and particularized.

395.   Plaintiff's injuries to his Fifth Amendment rights are caused by the NFA, GCA, the Rule, and Defendants' determinations.

396.   Plaintiff's injuries would be fully redressed by granting the requested the relief.

## CLAIM SEVEN

### Violation of United States Constitution, Article I, Sec. 9, Cl. 3 – Ex Post Facto Laws

397.   Plaintiff incorporates herein by reference the facts in the preceding paragraphs and all exhibits to this *Complaint*.

398.    Defendants' retroactive interpretation of the NFA, GCA, and 18 U.S.C. § 922(r) subjects Plaintiff to *ex post facto* criminal liability for purchasing or making braced firearms or SBRs.

399.    Defendants provided no assurances of discretionary non-enforcement to remedy any violation of 18 U.S.C. § 922(r).

400.    Plaintiff has no other remedies under the law.

401.    Plaintiff suffers imminent and ongoing harm that is irreparable, concrete and particularized.

402.    Plaintiff's injuries from *ex post facto* liability are caused by the NFA, GCA, the Rule, and Defendants' determinations.

403.    Plaintiff's injuries would be fully redressed by granting the requested the relief.

## RELIEF REQUESTED

WHEREFORE, Plaintiff requests that judgment be entered in his favor and against Defendants as follows:

404.    Declare that the Rule, RIN 1140-AA55, is held unlawful and set aside.

405.    Declare that regulation of braced pistols, short-barreled rifles, and short-barreled shotguns under the Rule, NFA, GCA, and Defendants' determinations violates the Second Amendment to the United States Constitution.

406.    Declare that Defendants' Rule and determinations create *ex post facto* liability on Plaintiff.

407.    Declare that regulating interstate transportation of braced pistols, short-barreled rifles, and short-barreled shotguns violates the Second and Tenth Amendments.

408.    Declare that the National Firearms Registration and Transfer Record violates the Fourth and Fifth Amendments of the United States Constitution.

409.   Declare that 18 U.S.C. §922(r) does not apply to end-users purchasing foreign-made pistols who then convert those pistols into braced pistols or SBRs.

410.   Declare that 18 U.S.C. § 922(r) violates the Second Amendment.

411.   Temporarily restrain, and preliminarily and permanently enjoin Defendants from enforcing any provisions of law, rule, or regulation this Court deems violative of law or the U.S. Constitution, in a nationwide injunction.

412.   Order Defendants to provide a tax-exempt transfer of all firearms Plaintiff registers as an individual pursuant to the Rule to his Trust.

413.   Enter an order awarding Plaintiff his costs of this suit, including any attorney fees and costs pursuant to 42 U.S.C. §1988 and damages.

414.   Order any other that the court deems just and appropriate.

I hereby certify and verify under penalty of perjury under the laws of the United States that the foregoing is true and correct. 28 U.S.C. §1746.

EXECUTED ON February 13, 2023.

-s- _Robert M. Miller_

Robert M. Miller, Ph.D.
4094 Majestic Ln., #278
Fairfax, VA 22033
(415) 596-2444
RobMiller44@hotmail.com

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on February 13, 2023, a copy of the foregoing

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** and

**EXHIBITS** was filed in person at the Court.

I caused a copy of this filing to be served by certified U.S. Mail to:

U.S. Attorney for the Eastern District of Virginia
ATTN: Civil Process Clerk
Justin W. Williams U.S Attorney's Building
2100 Jamieson Ave
Alexandria, VA 22314

Steven Dettelbach, Director
Bureau of Alcohol, Tobacco, Firearms,
and Explosives
99 New York Ave, NE
Washington, DC  20226

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Ave, N.W.
Washington, D.C. 20530-0001

Robert M. Miller
*Pro Se*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRIGINIA**
_Alexandria_ **DIVISION**

FILED

2023 FEB 13  A 11: 25

_ROBERT MILLER_
Plaintiff(s),

v.
_MERRICK GARLAND, US AG_
_STEVEN DETTELBACH, DIRECTOR BATFE_
Defendant(s).

Civil Action Number: _1:23-cv-195_

## LOCAL RULE 83.1(M) CERTIFICATION

I declare under penalty of perjury that:

No attorney has prepared, or assisted in the preparation of _VERIFIED COMPLAINT_.
(Title of Document)

_ROBERT MILLER_
Name of _Pro Se_ Party (Print or Type)

_[signature]_
Signature of _Pro Se_ Party

Executed on: _FEB 13, 2023_ (Date)

**OR**

The following attorney(s) prepared or assisted me in preparation of _____.
(Title of Document)

_____
(Name of Attorney)

_____
(Address of Attorney)

_____
(Telephone Number of Attorney)
Prepared, or assisted in the preparation of, this document

_____
(Name of _Pro Se_ Party (Print or Type)

_____
Signature of _Pro Se_ Party

Executed on: _____ (Date)