# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA



| | |
|---|---|
| ROBERT M. MILLER,<br>            *Plaintiff,*<br><br>        v.<br><br>MERRICK B. GARLAND, U.S. Attorney General,<br>U.S. DEPARTMENT OF JUSTICE; STEVEN<br>DETTELBACH, Director, Bureau of Alcohol<br>Tobacco, Firearms, and Explosives; BUREAU<br>OF ALCOHOL, TOBACCO, FIREARMS AND<br>EXPLOSIVES,<br>            *Defendants.* | Civ. Case No: 1:23-cv-195<br><br><br>ORAL HEARING REQUESTED |

## APPLICATION FOR A NATIONWIDE TEMPORARY RESTRAINING ORDER AND A PRELIMINARY AND PERMANENT INJUNCTION

Robert M. Miller, Ph.D.
4094 Majestic Ln, #278
Fairfax, VA 22033
(415) 596-2444
RobMiller44@hotmail.com

March 10, 2023

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................................iv

INTRODUCTION ..............................................................................................................1

JURISDICTION AND STANDING ...................................................................................4

    A.   Injury in Fact ...................................................................................................5

    B.   Plaintiff's Injuries Are Directly Attributable to the Rule, NFA, and GCA.....................6

    C.   A Favorable Decision Will Redress All Harm. ................................................7

    D.   Prudential Standing .........................................................................................7

LEGAL STANDARDS .......................................................................................................8

ARGUMENT .....................................................................................................................10

I.     PLAINTIFF IS LIKELY TO PREVAIL ON THE MERITS............................................10

    A.   The Rule's Regulatory Analysis Was Fatally Deficient.................................10

        1.   The Rule Failed to Identify the Need for Rulemaking. ...............................10

        2.   The Rule Failed Its Cost-Benefit Analysis (CBA). ....................................12

        3.   The Rule Failed to Adequately Consider Regulatory Alternatives ...........................18

    B.   The Rule's Immediate Effective Date Was Unlawful ....................................19

    C.   Agency's Classifications Are Arbitrary and Capricious. ...............................21

    D.   Agency Relied on Factors Congress Did Not Intend for It to Consider........................23

    E.   Plaintiff's Guns Show the Rule Is Arbitrary and Based on False Conclusions............25

    F.   The Rule Violates the Second Amendment....................................................26

        1.   Braced Pistols and SBRs are Bearable Arms Presumptively Protected by the 2A. ..26

        2.   SBRs and Braced Pistols Are in Common Use for Lawful Purposes .......................27

  3. There Are No Historical Analogues of Regulating SBRs and SBSs..........................29

  4. SBRs Are Neither Dangerous Nor Unusual ...............................................30

 G. Defendants Cannot Rewrite the NFA or GCA. ..............................................34

 H. The Rule Attempts to Answer a Major Question Reserved to Congress ......................35

 I. Lenity and Vagueness Militate against the Rule's Interpretations. ...............................36

 J. Agency's Interpretations Are Not Deserving of Deference. ...........................................39

 K. The Rule Imposes *Ex Post Facto* Criminal Liability. ....................................................41

II. THE RULE CAUSES PLAINTIFF IRREPARABLE HARM .........................................42

III. BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR PLAINTIFF...............43

IV. BONDS, SECURITY, OR SURETIES.................................................................................44

V. CONCLUSION ......................................................................................................................44

VI. RELIEF REQUESTED .........................................................................................................44

## TABLE OF AUTHORITIES

### CASES

*Amazon.com, Inc. v. WDC Holdings*, Civil Action No. 1:20-cv-484 (E.D. Va. July 28, 2020) ..... 9

*Ameren Servs. Co. v. Fed. Energy Regulatory Comm'n*, 893 F.3d 786 (D.C. Cir. 2018) ............... 5

*American Bankers Association v. Connell*, 686 F.2d 953 (D.C. Cir. 1979) .................................. 34

*American Trucking Ass'n v. United States*, 755 F.2d 1292 (7th Cir. 1985) .................................... 7

*Automated Merch. Sys., Inc. v. Rea*, 45 F. Supp. 3d 526 (E.D. Va. 2014) .................................... 17

*Blackhawk Industries Products Group Unlimited LLC v. United States General Services Administration*, 348 F. Supp. 2d 662 (E.D. Va. 2004) .................................................................. 4

*Burlington Truck Lines v. United States*, 371 U.S. 156 (1962) ...................................................... 23

*Burnham Corp. v. Adamkus*, 750 F. Supp. 282 (S.D.Ohio 1990) .................................................... 7

*Caminetti v. United States*, 242 U.S. 470 (1917) .......................................................................... 37

*Camp v. Pitts*, 411 U.S. 138 (1973) ............................................................................................... 17

*Casa De Md., Inc. v. Trump*, 971 F.3d 220 (4th Cir. 2020) ............................................................ 9

*Chamber of Commerce v. SEC*, 412 F.3d 133 (D.C. Cir. 2005) .................................................... 18

*Chamber of Commerce v. Sec. and Exch. Com'n*, 412 F.3d 133 (D.C. Cir. 2005) ........................ 12

*Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837 (1984) ............................................. 39

*City of Mesquite v. Aladdin's Castle. Inc.*, 455 U.S. 283 (1982) ................................................... 36

*Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388 (1987) .......................................................................... 4

*Ctr. for Bio. Diversity v. U.S. Bur. of Land Mgmt.*, 698 F.3d 1101 (9th Cir. 2012) .................... 13

*Di Biase v. SPX Corp.*, 872 F.3d 224 (4th Cir. 2017) .................................................................... 8

*District of Columbia et al. v. Heller*, 554 U.S. 570 (2008) ........................................................... 27

*Elrod v. Burns*, 427 U.S. 347 (1976) ............................................................................................. 42

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) .............................................. 41

iv

*Faic Securities, Inc. v. United States*, 595 F. Supp. 73 (D.D.C. 1984) ..........................................34

*Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495 (4th Cir. 1981) ................................8

*Geiger v. Abarca Family Inc.*, Civil Action 3:21-cv-771 (E.D. Va. July 29, 2022) ......................8

*Georgia-Pacific Consumer Prods. LP v. Von Drehle Corp.*, 781 F.3d 710 (4th Cir. 2015)...........9

*Grimm v. Gloucester Cnty. Sch. Bd.*, 400 F. Supp. 3d 444 (E.D. Va. 2019)...................................8

*Groyned v. City of Rockford*, 408 U.S. 104 (1972) ......................................................................36

*Hias, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021).........................................................................9

*Hill v. Coggins*, 867 F.3d 499 (4th Cir. 2017)...............................................................................36

*Industrial Safety Equip. Ass'n, Inc. v. EPA*, 656 F. Supp. 852 (D.D.C. 1987), aff'd, 837 F.2d 1115

    (D.C. Cir. 1988)........................................................................................................................7

*Int'l Refugee Assistance Project,  Inc. v. Trump*, 241 F. Supp. 3d 539 (D. Md. 2017) ..................4

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019).......................................................................................21

*Laclede Gas Co. v. F.E.R.C.*, 873 F.2d 1494 (D.C. Cir. 1989) .....................................................18

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) .......................................................................4, 8

*Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012)....8

*McCulloch v. Maryland*, 4 Wheat. 316, 4 L.Ed. 579 (1819)........................................................10

*Minneapolis St. Louis Ry. Co. v. Gardner*, 177 U.S. 332 (1900).................................................36

*Miranda v. Garland*, 34 F.4th 338 (4th Cir. 2022).......................................................................42

*Motor Veh. Manu. Assoc. v. State Farm Auto Mut. Ins. Co.*, 463 U.S. 29 (1983) .......................23

*National Min. Assn. v. McCarthy*, 758 F.3d 243 (CADC 2014) ...................................................21

*Natural Resources Defense Council v. Wheeler*, 955 F.3d 68 (D.C. Cir. 2020) ...........................21

*New York State Rifle & Pistol Assn., Inc. v. Bruen*, No. 20-843 (June 23, 2022) .................26, 27

*Nicopure Labs, LLC v. Food & Drug Admin.*, 266 F. Supp. 3d 360 (D.D.C. 2017)....................13

*Off. Comm. of United Church of Christ v. FCC*, 779 F.2d 702 (D.C. Cir. 1985) ........................18

*Ohio Valley Environmental Coalition v. United States Army Corps of Engineers*, 479 F. Supp. 2d
    607 (S.D.W. Va. 2007).........................................................................................................4

*Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013).................................................................................8

*Patient Servs., Inc. v. United States*, Civil Action No. 3:18-cv-16 (E.D. Va. Jan. 18, 2019) .......17

*Public Citizen v. Fed. Motor Carrier Safety*, 374 F.3d 1209 (D.C. Cir. 2004)..............................12

*Robishaw Engineering Inc. v. U.S.*, 891 F. Supp. 1134 (E.D. Va. 1995).........................................7

*Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020)...........................................................................9

*Sarsour v. Trump*, 245 F. Supp. 3d 719 (E.D. Va. 2017).................................................................9

*Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87 (1995) .......................................................21

*Trump v. Int'l Refugee Assistance Project*, ⸺ U.S. ⸺, 137 S. Ct. 2080, 198 L.Ed.2d 643 (2017)
    ....................................................................................................................................................9

*U.S. v. Comstock*, 560 U.S. 126 (2010).........................................................................................10

*U.S. v. Gray*, 883 F.2d 320 (4th Cir. 1989) ....................................................................................6

*U.S. v. Jennings*, 323 F.3d 263 (4th Cir. 2003) .............................................................................37

*U.S. v. Wright*, 3:18-CR-162 (N.D. Ohio 2018).............................................................................12

*United States v. Beason*, No. 11-4676 (4th Cir. Apr. 19, 2013)......................................................36

*United States v. Brewer*, 533 F. App'x 234 (4th Cir. 2013) ...........................................................36

*United States v. Thompson/Center Arms Co.*, 504 U.S. 505 (1992) ........................................36, 38

*Wilderness Watch, Inc. v. U.S. Fish & Wildlife Serv.*, 629 F.3d 1024 (9th Cir. 2010) .................18

*Williams v. Johnson*, 1:10-cv-823 (E.D. Va. Sep. 12, 2011)..........................................................36

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008).....................................................8, 9

## STATUTES

18 U.S.C. § 921 ...........................................................................................................37

18 U.S.C. § 926 ...........................................................................................................10

18 U.S.C. §922 .............................................................................................................1

26 U.S.C. § 7201 .........................................................................................................36

26 U.S.C. § 7203 .........................................................................................................36

26 U.S.C. § 7805 .........................................................................................................10

28 U.S.C. §1746 ..........................................................................................................45

5 U.S.C. § 553 ........................................................................................................19, 20

5 U.S.C. § 601 et seq ...................................................................................................18

5 U.S.C. § 701 et seq. ...................................................................................................2

5 U.S.C. § 702 ..............................................................................................................4

5 U.S.C. § 801 et seq. ...........................................................................................2, 19, 20

Gun Control Act of 1968, Pub. L. 90-618 ...........................................................passim

National Firearms Act of 1934, Pub. L. 73-474 ..................................................passim

## OTHER AUTHORITIES

*Hearings Before the Committee on Ways and Means*, House of Representatives, Seventy-Third
   Congress, Second Session on H.R. 9066, Apr. 16, 18, and May 14, 16, 1934 ........................32

## REGULATIONS

27 C.F.R. 478.11.........................................................................................................37

27 C.F.R. 479.11.........................................................................................................37

*Bump-Stock-Type Devices*, RIN 1140-AA52, 83 FR 66514 .........................................14

*Definition of 'Frame or Receiver' and Identification of Firearms*, RIN 1140-AA54, 87 FR 24652 ........................................................................................................................................14

*Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* RIN 1140-AA55, 88 FR 6478 ....................................................................................................................................1

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. II .................................................................................................................passim

U.S. Const. amend. IV .......................................................................................................................6

U.S. Const. amend. V .........................................................................................................................6

U.S. Const. Art I ...............................................................................................................................10

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| ROBERT M. MILLER,<br>        *Plaintiff,*<br><br>    v.<br><br>MERRICK B. GARLAND, U.S. Attorney General,<br>U.S. DEPARTMENT OF JUSTICE; STEVEN<br>DETTELBACH, Director, Bureau of Alcohol<br>Tobacco, Firearms, and Explosives; BUREAU<br>OF ALCOHOL, TOBACCO, FIREARMS AND<br>EXPLOSIVES,<br>        *Defendants.* | Civ. Case No: 1:23-cv-195<br><br>ORAL HEARING REQUESTED |

## APPLICATION FOR A NATIONWIDE TEMPORARY RESTRAINING ORDER AND A PRELIMINARY AND PERMANENT INJUNCTION

Pursuant to Fed.R.Civ.P. 65, Plaintiff moves this Court to temporarily restrain and to preliminarily and permanently enjoin Defendants from enforcing their rule, *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* ("Rule"), RIN 1140-AA55, 88 FR 6478, which became final and effective on January 31, 2023. Plaintiff also seeks injunctive relief against enforcement of 18 U.S.C. §922(a)(4) and (r) as they apply to firearm owners, and portions of the National Firearms Act of 1934, Pub. L. 73-474 and Gun Control Act of 1968, Pub. L. 90-618. The U.S. Attorney did not respond to messages left on March 9—10, 2023 to confer on this motion.

## INTRODUCTION

The Rule at issue redefines the NFA and GCA to encompass pistols outfitted with stabilizing arm braces ("braces") that facilitate the use of pistols with one hand, especially for firearms that are heavy or for people with disabilities. From 2012 through 2020, Defendants issued dozens of classifications that various types of braces *did not* convert braced pistols into short-

barreled rifles (SBRs). At one point during that period, Defendants reversed their classification, saying that if a brace were not usable as a brace, and if it could only be used as a stock, and was actually used as a stock, then it constituted making an SBR. But Defendants reversed course again, stating that incidental shouldering of braces did not redesign the firearm to be fired from the shoulder, i.e., a rifle. The Rule reverses prior determinations for the third time, not based on any newfound evidence or change in the law, but purely to advance a political agenda of gun control.

The Rule must be held unlawful and set aside because it is arbitrary, capricious, an abuse of discretion, and not otherwise in accordance with law; contrary to constitutional rights, without observance of procedure required by law, unsupported by substantial evidence and unwarranted by facts. 5 U.S.C. § 706. The Rule's regulatory analysis failed to identify a significant problem requiring regulation at the federal level. It's cost-benefit analysis failed to monetize or quantify Rule benefits, and to the extent they described benefits qualitatively, the Rule did not explain the causal chain from the Rule's provisions to the benefits claimed. The Rule vastly underestimated its costs. The Rule failed to adequately address public comments and to reasonably consider alternative regulatory approaches, especially the *status quo ante*.

This *Application* shows that Defendants violated the Administrative Procedure Act, 5 U.S.C. § 701 et seq., and Congressional Review Act, 5 U.S.C. § 801 et seq., by promulgating a legislative rule without delaying the effective date by 30 and 60 days, respectively. The factors upon which Defendants rely in classifying braced pistols as rifles are nowhere to be found in the NFA and GCA, and Defendants' criteria are vague and subjective despite their repeated insistence that the factors are objective.

In prior classifications, Defendants appropriately reached lenient interpretations that if a braced pistol can be used with one hand, then it meets the statutory definition of a pistol. The Rule

turns that upside down to a prohibitive interpretation that if a brace can be used against the shoulder, then the firearm is a rifle. This violates the Rule of Lenity.

The Rule, NFA, and the GCA violate the Second Amendment because they regulate bearable arms that have been in common use for lawful purposes long before the ratification of that amendment, and Defendants can show no historical analogues of regulating these guns prior to the NFA and GCA. Short-barreled rifles and shotguns are not "dangerous and unusual" and are, indeed, less dangerous than their longer-barreled counterparts because projectiles from such guns have lower velocity and hence less kinetic energy. The braced pistols are also *less* concealable than otherwise identical Title I pistols and handguns. Exh. 1, Fig. 37 There are no historical analogues to the Founding regulating *concealable* weapons, as opposed to *concealed* weapons.

The Rule imposes instantaneous *ex post facto* criminal liability on Plaintiff that is incurable by complying with the law after notification of the Agency's interpretations of 18 U.S.C. § 922(r). The Rule immediately prevents Plaintiff from selling his braced pistols as Title I firearms or carrying them across state lines and causes him economic harm.

Plaintiff is likely to prevail in his claims because this *Application* shows numerous reasons why the Rule is unlawful, and even one of those is sufficient to set aside the Rule. Because the Rule causes Plaintiff imminent, ongoing, concrete, and particularized irreparable harm directly attributable to the Rule, and granting this *Application* would completely redress such harm, this Court should grant the requested preliminary relief. Because the scope of the Rule affects Plaintiff outside his home state, and because the Rule has sweeping effects across the entire Nation, and in

3

the face of numerous court challenges throughout the Nation,[1] this Court should grant a nationwide injunction.

## JURISDICTION AND STANDING

Plaintiff incorporates herein by reference and realleges facts contained in his *Verified Complaint*, ECF 1, and exhibits to his complaint. Plaintiff alleges new facts as verified herein.

This Court has jurisdiction to review, hold unlawful, and set aside final agency rules under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. 5 U.S.C. § 702 ; *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 394, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987)." *Int'l Refugee Assistance Project, Inc. v. Trump*, 241 F. Supp. 3d 539, 551 (D. Md. 2017); *Blackhawk Industries Products Group Unlimited LLC v. United States General Services Administration*, 348 F. Supp. 2d 662, 670 (E.D. Va. 2004).

Plaintiff must first demonstrate Article III standing by showing he (1) suffered injury in fact; (a) that is concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action; (3) it is likely that the injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *Ohio Valley Environmental Coalition v. United States Army Corps of Engineers*, 479 F. Supp. 2d 607, 617 (S.D.W. Va. 2007). After establishing Article III standing, Plaintiff must demonstrate prudential standing by showing that his interests merely *arguably* fall within the zone of interests of the challenged statute giving rise to the Agency's regulation. *Int'l Refugee, supra* at 551.

---

[1] *Firearms Regulatory Accountability Coalition, Inc., et al. v. Garland*, 1:23-cv-24 (D. North Dakota); *Mock v. Garland*, 4:23-cv-95 (N.D. Tex.); *Britto, et al., v. BATFE*, 2:23-cv-19 (N.D. Tex.); *SAF, et.al. v. BATFE, et. al.*, 3:21-cv-116 (N.D. Texas); *Watterson v. ATF*, No. 4:23-cv-90-ALM (E.D. Tex.); *Texas v. ATF*, No. 6:23-cv-13 (S.D. Tex.).

## A. **Injury in Fact**

"[A] regulated party generally has standing to challenge an agency action regulating its behavior…" *Ameren Servs. Co. v. Fed. Energy Regulatory Comm'n*, 893 F.3d 786, 792 (D.C. Cir. 2018). The Rule directly regulates Plaintiff's actions and firearms and exposes him to felony criminal liability and restrictions. The restrictions the Rule places upon Plaintiff's property and liberty violate his rights under the Second Amendment to keep and bear arms. The deprivation of constitutional rights, even temporarily, always constitutes irreparable harm. *Grimm, Ross, infra*.

The Rule criminalizes Plaintiff's possession, use, transportation, and sale of a Q Honey Badger (QHB) pistol that was originally and permanently fitted with a stabilizing arm brace. *Compl.* ¶ 252—263. No parts are available to make the QHB into a braceless pistol because of Q's proprietary design. Exh. 1, Fig. 11. When Q later makes one, they will cost more than $300. *Id*. Plaintiff's only options are to destroy, surrender, or disassemble the gun, making it unusable.

Plaintiff also owns a Ruger 10/22 pistol and an AR-15 with braces. *Compl.* ¶ 276—277; Exh. 1, Figs. 18, 41. Plaintiff has used and intends to use the braces on these firearms. *Compl.* ¶ 46. Plaintiff owns a Mossberg Shockwave "shotgun" to which he attached a stabilizing brace, which he removed when Defendants began rulemaking, e.g., Exh. 1, Fig. 3; *Compl.* ¶ 251.

Plaintiff also owns several foreign-made firearms he made into SBRs, including a B&T APC-9 and APC-45, an FN SCAR 17, a CZ Bren 2, Sig P556, and an IWI Galil Ace, e.g., Exh. 1, Figs 19—22. The Rule's interpretation of 18 U.S.C. § 922(r) would make Plaintiff a felon, claiming he "assembled" a firearm "not particularly suited for sporting purposes" with more than ten foreign parts. 18 U.S.C. § 921. Plaintiff uses these SBRs for home defense. *Compl.* ¶ 251.

In the absence of the Rule, Plaintiff would make or buy additional braced pistols. In the absence of the NFA and GCA, Plaintiff would make or buy additional SBRs and SBSs. The Rule

will cause Plaintiff to engrave markings, at a cost of about $65 for each of his braced pistols that will irreparably deface those pistols. *Compl.* ¶ 262. The Rule will prevent Plaintiff from taking his braced pistols across state lines without Defendants' permission, and not at all to at least three to six states that do not allow SBRs. RIA at 93—94. No later favorable judgment can correct this.

Since 2020, Plaintiff has received no paychecks from his employer because of whistleblower retaliation. To meet financial obligations, Plaintiff has been selling firearms. The Rule imposes imminent costs on Plaintiff by requiring him to pay a $200 tax when he sells his newly classified SBRs. 26 U.S.C. § 5811(b). The tax reduces demand for Plaintiff's braced pistols, thus they have lost market value. Plaintiff must also file an ATF Form 4 for each braced pistol sold, and the buyer would have to wait more than nine months for an approved tax stamp.

The Rule further injures Plaintiff by forcing him to put his lawful Title I firearms on the National Firearms Registration and Transfer Record (NFRTR), violating his Fourth and Fifth Amendment rights. Plaintiff is not free to decline the information requested. *U.S. v. Gray*, 883 F.2d 320, 322 (4th Cir. 1989). Defendant has no warrant or probable cause to obtain the information required for an ATF Form 1 or Form 4. The information provided could be used to prosecute Plaintiff for felony crimes under the NFA or GCA.

### B. Plaintiff's Injuries Are Directly Attributable to the Rule, NFA, and GCA.

On January 30, 2023, Plaintiff was the lawful owner of at least five braced pistols. *Compl.* ¶ 243. On January 31, 2023, Plaintiff woke up a felon. Prior to the effective date, Plaintiff had no obligation to register or mark his Title I braced pistols, nor was he required to file a Form 20 to carry his braced pistols across state lines or file a Form 4 and pay a $200 tax to sell his braced pistols. Prior to the effective date, there were no nationally issued Agency opinions that a gun owner making an SBR from a foreign-made pistol would violate 18 U.S.C. §922(r) if it had more

than ten foreign-made parts; the Rule was widely believed to apply only to importers or manufacturers, not retail customers for their own use.

Defendants argue that braced pistols were *always* SBRs, and the Rule does not impose any new harm on Plaintiff. "This rule does not itself impose any new restrictions; instead, this rule articulates the best interpretation of the relevant statutory terms. Nothing in this rule changes those underlying statutory requirements." Rule at 6554. "Courts have…construed 'agency action' to include statements that announce a rule of law, impose obligations, determine rights or liabilities, or fix legal relationships. See *American Trucking Ass'n v. United States*,755 F.2d 1292, 1296 (7th Cir. 1985); *Industrial Safety Equip. Ass'n, Inc. v. EPA*, 656 F. Supp. 852, 855 (D.D.C. 1987), aff'd, 837 F.2d 1115 (D.C. Cir. 1988). Thus, 'agency action' includes an agency's legal interpretations. See *Burnham Corp. v. Adamkus*, 750 F. Supp. 282, 285 (S.D. Ohio 1990)." *Robishaw Engineering Inc. v. U.S.*, 891 F. Supp. 1134, 1150-51 (E.D. Va. 1995).

### C. **A Favorable Decision Will Redress All Harm.**

If the Court grants this *Application* and sets aside the Rule, the status of Plaintiff's braced pistols would revert to the *status quo ante*. If the Court declares that 18 U.S.C. § 922(r) does not apply to consumers, then Plaintiff's foreign-made pistols converted to SBRs would not be unlawful. If the Court declares that 18 U.S.C. § 922(a)(4) is unconstitutional because it restricts the right to carry arms across state lines for lawful purposes, then the infringement on those rights would be completely vindicated. If the Court declares the NFA and GCA unconstitutional as relating to SBRs, then all burdens and restrictions would be lifted entirely.

### D. **Prudential Standing**

"The scope of the zone of interests is not especially demanding, and the plaintiff receives the benefit of any doubt." [internal quotes omitted] *Geiger v. Abarca Family Inc.*, Civil Action

3:21-cv-77, at *13 (E.D. Va. July 29, 2022); *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 132 S.Ct. 2199, 2210, 183 L.Ed.2d 211 (2012). The zone of interest test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." [internal quotes omitted] *Id.* Plaintiff's interest in and uses of these firearms falls within the zone of interest of the NFA and the GCA – the two federal statutes cited by the Rule as providing Defendants the authority for this rulemaking. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), 112 S.Ct. 2130.

## LEGAL STANDARDS

A preliminary injunction is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) citing *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013). A preliminary injunction shall be granted only if the moving party clearly establishes entitlement to the relief sought. *Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495, 499 (4th Cir. 1981). A plaintiff seeking a preliminary injunction must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), 129 S.Ct. 365. Courts considering whether to impose preliminary injunctions must separately consider each Winter factor. *Pashby* at 321.

The deprivation of constitutional rights unquestionably constitutes irreparable injury for purposes of equitable jurisdiction. *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987); *Grimm v. Gloucester Cnty. Sch. Bd.*, 400 F. Supp. 3d 444, 461 (E.D. Va. 2019).

A plaintiff need not establish a "certainty of success," but must make a clear showing that he is likely to succeed at trial. *Id.* Similarly, a plaintiff must demonstrate more than just a "possibility" of irreparable harm. *Winter* at 22. "When the government is a party … the balance of the equities and the public interest … merge." *Casa De Md., Inc. v. Trump*, 971 F.3d 220, 255 (4th Cir. 2020). This Court can grant a nationwide injunction, appropriately tailored to prevent irreparable injury to the prevailing party. *Georgia-Pacific Consumer Prods. LP v. Von Drehle Corp.*, 781 F.3d 710, 715 (4th Cir. 2015). A district court may issue a nationwide injunction so long as the court "mold[s] its decree to meet the exigencies of the particular case." *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020) (quoting *Trump v. Int'l Refugee Assistance Project*, —— U.S. ——, 137 S. Ct. 2080, 2087, 198 L.Ed.2d 643 (2017)). And a nationwide injunction may be appropriate when the government relies on a "categorical policy," and when the facts would not require different relief for others similarly situated to the plaintiffs. *Id.* at 232-33. A district court did not abuse its discretion in issuing a nationwide injunction when, by a policy's nature, adversely affected persons were spread throughout the country and enjoining the policy only as to the plaintiff would cause inequitable treatment the law (or the U.S. Constitution) was designed to protect. *Hias, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021).

"The standard for granting either a TRO or preliminary injunction is the same." *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017); *Amazon.com, Inc. v. WDC Holdings*, Civil Action No. 1:20-cv-484, at *7 (E.D. Va. July 28, 2020).

## ARGUMENT

### I.   PLAINTIFF IS LIKELY TO PREVAIL ON THE MERITS

#### A. The Rule's Regulatory Analysis Was Fatally Deficient.

##### 1.   The Rule Failed to Identify the Need for Rulemaking.

The United States Congress is empowered by the U.S. Constitution "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. Art I, Section 8. Subject only to Constitutional principles, the law presumes all statutes are necessary and proper. *U.S. v. Comstock*, 560 U.S. 126, 134 (2010); *McCulloch v. Maryland*, 4 Wheat. 316, 421, 4 L.Ed. 579 (1819).

But federal agencies do not inherit these broad powers and judicial deference from Congress. They possess only the powers explicitly granted to them by Congress and under the limitations set by Congress and the Constitution. The APA requires federal agencies to *prove* a rule is necessary and appropriate. See 26 U.S.C. § 7805(a); 18 U.S.C. § 926.

To meet the necessity burden, every rule must identify a "significant" or "compelling" problem requiring federal regulation. Exh. 8, OMB Circular A-4 at 3—4; Exh. 9, Executive Order 12866 at 1. It is insufficient to identify rare and sporadic harms affecting relatively few people.

To show a rule is appropriate, the agency must *prove* the rule will solve the problem identified, that the benefits of the rule outweigh its costs, that there are no other less burdensome but effective alternatives, and that regulation at the federal level is necessary. *Id.*

Supporting its "need" for rulemaking, Agency argues that pistols with stabilizing arm braces were used in mass shootings in Boulder, CO, and Dayton, OH, and that "since 2015, ATF reports that approximately 63 firearms with stabilizing braces have been traced in criminal investigations, and that it has "105 firearms cases or investigations involving stabilizing brace

devices." Rule at 6499. With all due respect to the tragic losses in Boulder and Dayton, two mass shootings using braced pistols fails to identify the need to regulate the *millions* of braced pistols used for lawful purposes. None of the sources the Rule relies upon states the shooters put the braced pistols against their shoulders. No evidence shows those weapons were concealed.

All economic analysis is made *at the margin*. Defendants do not get to assume that if the Rule were in effect prior to the Boulder and Dayton shootings, that those would not have happened. Even if the shooters complied with the Rule, which they likely would not have, they had next-best alternatives of using pistols without braces, rifles, handguns, and shotguns. A rule may only claim benefits for the *difference* between a world with the rule and the counterfactual world without it.

The entire purpose of the APA, OMB Circular A-4, and Executive Order 12866 is to prevent agencies from burdening the public with costly regulations that are not justified by need or benefits. A mere 63 braced pistols "traced" to crime scenes and 105 investigations over an ***eleven-year period***, out of *millions* of braces used for lawful purposes, does not constitute a significant problem requiring regulation. Rifles of every kind are known to be used in 2.6% of homicides each year, and obviously SBRs (or braced pistols) are a small fraction of those. *Compl.* ¶ 54—58. The Rule could have, but did not, provide data on the use of SBRs (registered or not) in crimes.

The Rule asserts that "Given the wide variety of configurations of weapons and 'stabilizing braces,' this rule is 'necessary' or 'needful' to clarify the meaning of [the phrase] ["designed or redesigned, made or remade, and intended to be fired from the shoulder."] Rule at 6500. This is the second consecutive rule Defendants have claimed to "clarify" provisions of law when Defendants are changing the law to make themselves right in future prosecutions. After Defendants lost a criminal case in *United States v. Rowold*, 429 F. Supp. 3d 469, 475–76 (N.D. Ohio 2019),

they redefined a "receiver" to prevent similar rulings. *Definition of a Frame or Receiver and Identification of Firearms*, RIN 1140-AA54, 87 FR 24655. In that same regulation, Defendants created regulations to implement the *Crime Gun Tracing Modernization Act*, S.2974 (115th Congress), S.3348 (116th Congress), which failed to pass. After Defendants lost a criminal case in which they attempted to use a diagonally-measured length of pull exceeding 13.5 inches to prosecute someone for possessing a braced pistol as an SBR, *U.S. v. Wright*, 3:18-CR-162, (N.D. Ohio 2018) [sealed], they seek to "regulate themselves right" by issuing a rule that "clarifies" what the court in that case expressly rejected on the merits of their arguments. In that case, Defendants filed a motion *in limine* (denied) to prevent the jury from considering Agency's prior classifications, claiming they are "not precedential," and that "each letter relates to specific firearm design specifications and prototypes that have nothing to do with this case ... and creates a grave risk of confusing the issues and misleading the jury." Thus, Defendants admitted that whether a particular braced pistol is an SBR is idiosyncratic. If Defendants believe a jury would be confused by its prior determinations, then certainly persons affected by this Rule would also be confused. These rulemakings only serve as salve for the Agency's hurt feelings about failing to put people they deem as criminals behind bars. The rulemakings attempt to advance Democratic party policies they cannot pass through legislation in a divided Congress.

## 2. The Rule Failed Its Cost-Benefit Analysis (CBA).

That costs or benefits are difficult to measure "does not excuse [an agency] from its statutory obligation to determine as best it can the economic implications of the rule it has proposed." *Chamber of Commerce v. Sec. and Exch. Com'n*, 412 F.3d 133, 143 (D.C. Cir. 2005); *Public Citizen v. Fed. Motor Carrier Safety*, 374 F.3d 1209, 1221 (D.C. Cir. 2004). Courts

invalidate rules if agencies fail to consider policy effects. *Ctr. for Bio. Diversity v. U.S. Bur. of Land Mgmt.*, 698 F.3d 1101, 1124 (9th Cir. 2012).

The Rule's sole claims to benefits are: "(1) to prevent manufacturers and individuals from circumventing the requirements of the NFA; (2) to enhance public safety by reducing the criminal use of NFA firearms, which are easily concealable from the public and first responders." The first purported benefit begs the question, i.e., asserting what Defendants have a duty to prove – that braced pistols are SBRs, and that making braced pistols is designing an SBR. The mere desire to enforce a statute, without more, does not satisfy the Agency's burden to prove substantial benefits. The Rule did not articulate 'at least a general grasp of the rule's benefits." *Nicopure Labs, LLC v. Food & Drug Admin.*, 266 F. Supp. 3d 360, 406 (D.D.C. 2017). How many lives lost, or injuries would the Rule prevent by stopping people from circumventing the NFA? Defendants do not even attempt to estimate this. The second purported benefit is merely a restatement of the first benefit, and it does not attempt to explain how the Rule will reduce criminal use of NFA firearms. Like the *underpants gnomes* in the prime-time cartoon *South Park* explaining why they steal young boys' underpants, Defendants' Rule argues a causal relationship of:

1. Enact the Rule

2. ? ? ?

3. Benefits

This falls well short of the Agency's burden to justify the rule by *explaining* a causal chain from the regulations to the benefits. Agency is attempting to adopt the "necessary and proper" deference afforded to Congress in the NFA instead of meeting its burden to prove their actions are necessary and appropriate. The APA, OMB Circular A-4, and Executive Order 12866 require agencies to *monetize* rule benefits. Only if the agency explains why it cannot monetize benefits

may the agency *quantify* the benefits. Only if the agency explains why it cannot quantify benefits may it describe the benefits qualitatively. This progression of burdens prevents agencies from doing what Defendants do in the Rule: simply wave their hands in the air to claim substantial benefits. OMB Circular A-4, *passim*.

Defendants provided only a handful of anecdotes about crimes involving braced pistols including shootings in Dayton and Boulder, 104 Federal criminal classifications of braced pistols used in crimes, and 63 firearms with braces having been traced in criminal investigations – a total of only 169 incidents *potentially* using a braced pistol in crimes. Rule at 6499.

Defendants did not present *data* or *statistics*, which underly all good analysis in rulemaking. With ***billions*** of lawful uses of braced pistols from 2012 to the present, and only a few hundred known incidents of crimes with braced pistols, the incidence of crime with braced pistols as a share of braced pistol ownership and uses is close to zero. One-hundred sixty-nine criminal uses of braced pistols divided by 3 million braced pistols means only 0.006% of braced pistols have ever been used in crimes. Even if such crimes were underestimated by a factor of 100, only 0.6% of brace pistol owners will have committed crimes with them. And, of course, there is a likelihood that certain criminals could have committed multiple crimes with the same guns.

For the third consecutive rulemaking involving gun rights, Defendants claim substantial benefits for public safety without any monetization or quantification. See also *Definition of 'Frame or Receiver' and Identification of Firearms*, RIN 1140-AA54, 87 FR 24652 and *Bump-Stock-Type Devices*, RIN 1140-AA52, 83 FR 66514. Defendants could have, but did not, monetize the benefits of the Rule. To do so, Defendants would estimate the current number of criminal uses of braced pistols, explain in detail how the Rule would cause the reduction in crime, and estimate the post-

regulatory number of criminal uses, fatalities, or injuries. Then, the Agency would estimate the *value of a statistical life* ("VSL") and the expected value of firearm injuries with SBRs.

In all three rules, Defendants claimed there were *negative externalities* from the criminal use of firearms or devices the Agency sought to regulate. See, e.g., NPRM at 30845, 86 FR 27738, 87 FR 24715, 83 FR 66544. A negative externality is the adverse economic effect that the production or consumption of a good has on third parties who are neither the buyer nor seller of the good. The third parties receive no payment for the damages caused to them. An example of a production externality is the pollution from a factory that damages local residents. An example of a consumption externality is the adverse effects of second-hand cigarette smoke. For the *Bump-Stock* rule and the *Receiver* rule, Plaintiff submitted public comments demonstrating that there are no negative externalities from the criminal use of bump stocks or unmarked firearm receivers and, if there were they would be extremely small; the regulatory ban on bump stocks and unmarked receivers destroyed more social welfare than they saved (i.e., negative net benefits). Based on Plaintiff's comments, Defendants withdrew their reliance on negative externalities in both the *Receiver* rule and the *Brace* rule. See Rule at 6559. ("The Department agrees that there may be confusion about ATF's statement regarding the externality of the rule; therefore, the final regulatory analysis does not discuss externalities.") There was no confusion on the part of the public. Defendants deceived the public with highfalutin language to posit a market failure in their rules, and they got caught red-handed by professional economists. By withdrawing their reliance on the presence of negative externalities, Defendants literally withdrew the entire economic basis for their rule. Thus, the Rule fails to completely analyze the economic effects and fails the cost-benefit analysis.

15

Defendants grossly undercounted the number of individuals affected by the Rule and, hence, its costs. The Rule erroneously failed to account for braced pistols made from transferrable receivers or privately made receivers. Agency issued no Advance Notice of Proposed Rulemaking (ANPR) to obtain a more accurate count of ownership of braced pistols. "Each agency shall base its decisions on the best reasonably obtainable scientific, technical, economic, and other information concerning the need for, and consequences of, the intended regulation." EO 12866, Sec. 1(b)(7). A report by the Congressional Research Service found estimations of between 10 and 40 million braced pistols in use by the public. *Compl.* ¶ 158; Exh. 2. While the CRS report was unsourced, second-hand information, and not detailed, it was published two months prior to the proposed rule and clearly indicated that there were other sources of information that Defendants could have, but did not, identify. Commenters directly put Defendants on notice of the CRS report. Rule at 6560. In response, Defendants simply disagreed, saying 3 million braces is the more accurate measurement, without addressing why the other estimates are incorrect. *Id.* The Rule claims it relied on "anecdotal commentary from the manufacturers, information gleaned from ATF field offices throughout the United States, and subject matter experts' conclusions" without substantiating any of those claims. *Id.*

The Rule relied only on unnamed "subject matter experts" regarding the number of braced pistols in retail and distributor inventory without an ANPR to obtain the information from the public. Rule at 6561. While the Rule relies on an *average* of seven braced pistols in inventories, these pistols are clearly not uniformly distributed. Some small business owners could have most of their inventory in braced pistols that constitute most of their sales, while many FFLs have no braces at all.

16

The reason why this Rule and every other gun control rule fails cost-benefit analysis is obvious: the rules sweep too broadly to adversely affect *tens of millions* of law-abiding gun owners because of the actions of a few criminals. Defendants have never, and certainly cannot in this Rule, prove their measures will save lives, reduce injuries, or benefit "public safety."

The Rule did not reduce from expected benefits the amount of criminal non-compliance. People who intend to commit murder will obviously not heed regulations preventing them from having braces (or stocks) on pistols. The Rule affects only adversely law-abiding citizens. Even if the Rule did reduce the incidence of using braced pistols in crimes, the benefits would be only speculative. Law enforcement would have to miraculously catch a potential murderer with an illegal braced pistol *before* his crimes for the Rule to prevent any deaths or injuries. As add-on charges after a criminal incident, the marginal benefits for deterrence would be minimal.

The Rule gains credit only for the *marginal* reduction in deaths attributable to the Rule. If criminals obeyed the Rule, they would have other options to commit their crimes, such as unbraced pistols, registered SBRs, handguns, shotguns, and rifles. The Rule may claim credit only for the *reduction* in lives lost or injuries, not the total number currently inflicted with braced pistols.

Defendants cannot rescue their cost-benefit analysis in response because this Court relies solely on the administrative record. *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Patient Servs., Inc. v. United States*, Civil Action No. 3:18-cv-16, at *13 (E.D. Va. Jan. 18, 2019); *Automated Merch. Sys., Inc. v. Rea*, 45 F. Supp. 3d 526, 529 (E.D. Va. 2014). In so doing, Defendants also violated the Small Business Regulatory Enforcement Fairness Act

("SBREFA"), codified in 5 U.S.C. § 601 et seq., requiring Defendants to assess the impact of the Rule on small businesses, such as firearm retailers and manufacturers.[2]

Because Defendants utterly failed to present a meaningful cost-benefit analysis, Plaintiff is certain to prevail in this case.

### 3.   The Rule Failed to Adequately Consider Regulatory Alternatives

Courts invalidate rules for failure to consider regulatory alternatives also achieving rule objectives. *Off. Comm. of United Church of Christ v. FCC*, 779 F.2d 702, 714 (D.C. Cir. 1985); *Wilderness Watch, Inc. v. U.S. Fish & Wildlife Serv.*, 629 F.3d 1024, 1039 (9th Cir. 2010); *Chamber of Commerce v. SEC*, 412 F.3d 133, 144 (D.C. Cir. 2005). Where a party raises facially reasonable alternatives, the agency must either consider those alternatives or give some reason for declining to do so. *Laclede Gas Co. v. F.E.R.C.*, 873 F.2d 1494, 1498 (D.C. Cir. 1989). "It is not adequate simply to report a comparison of the agency's preferred option to the chosen baseline." OMB Cir. A-4, p. 16.

The first alternative to a proposed rule is usually the *status quo* or "no change" alternative. A side-effect of not monetizing, quantifying, or explaining the Rule's benefits is that Defendants have provided the public no reason to believe the Rule will be any better than simply maintaining its classifications for the past eleven years. Defendants gave short shrift to the *status quo*, stating that it has no costs or benefits. RIA at 7. A proper analysis would identify the advantages and disadvantages of the status quo alternative. This, Defendants did not do.

---

[2] While Plaintiff has no standing to sue under SBREFA, UMRA, CRA, or the Tenth Amendment, once he establishes standing, he is not limited under 5 U.S.C. § 706 to challenging as unlawful the Rule provisions harming him.

Defendants rejected comments suggesting the Agency grandfather existing braced pistols. Defendants again begged the question saying, "The Department disagrees that it must provide individuals a grandfather clause for currently possessed firearms equipped with 'stabilizing braces' that are short-barreled rifles under the NFA…" Rule at 6568. Agency also said it "cannot have a grandfather clause because providing one would inappropriately exempt individuals from future compliance with provisions of the NFA." *Id.* Defendants failed to consider and explain why they should not let Congress decide whether to amend the NFA and GCA to include braced pistols or otherwise clarify the definition of a rifle. Defendants did not consider allowing states, local, and tribal governments to regulate braced pistols.

Defendants' justifications for the Rule and rejection of feasible alternatives boil down to nothing more than an assertion that "Braced pistols are SBRs." This is not reasoned rulemaking.

### B. **The Rule's Immediate Effective Date Was Unlawful**

Title 5, United States Code, Pub. L. 89-554 (1966), 80 Stat. 383—384, requires that "The required publication or service of a substantive rule shall be made not later than 30 days before its effective date," with exceptions discussed below. 5 U.S.C. § 553(d).

The Congressional Review Act ("CRA"), codified in 5 U.S.C. § 801 et seq., mandates that before a rule can take effect, the Agency must submit to each House of the Congress and to the Comptroller General containing a copy of the rule, a concise general statement relating to the rule including whether it is a major rule; and the proposed effective date of the rule. 5 U.S.C. § 801(a)(1). A "major rule" is defined as any rule that the Office of Information and Regulatory Affairs ("OIRA") of the Office of Management and Budget ("OMB") finds has resulted in or is likely to result in an annual effect on the economy of $100 million or more; a major increase in costs or prices for consumers, individual industries, federal, state, or local government agencies or

geographic regions; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of U.S.-based enterprises to compete with foreign-based enterprises in domestic or export markets. 5 U.S.C. § 804(2). While not delving into the entire analysis under Section 804(2), as the Agency was required to do by law, the Agency admitted the Rule is a "major rule" for purposes of the CRA. Rule at 6574.

The Rule states, "For purposes of the Congressional Review Act, however, the Department will wait to actually initiate such enforcement actions for at least 60 days from publication of the rule in the Federal Register. See 5 U.S.C. 801(a)(3)." 88 FR 6481. The Agency either does not understand or ignores its obligations under the CRA. The CRA states that a major rule cannot "take effect" until the later of (A) 60 days after the date Congress receives the report submitted under Section 804(1), or the rule is published in the Federal Register; or (B) the earlier of the date on which either House of Congress votes and fails to override the veto of the President, or occurring 30 session days after the date on which the Congress received the veto and objections of the President; or (C) the date the rule would have otherwise taken effect. Defendants' effective date on the date of publication in the Federal Register and promise to not initiate enforcement actions fails to provide Congress the opportunity to disapprove of the Rule. The entire purpose of the CRA was to *prevent* all adverse effects of a major rule until after Congress and the President had the opportunity to consider the rule. This, Defendants did not do.

To evade the requirements of the CRA and the general requirement of a 30-day delay of the effective date after publication, Defendants claim the Rule is "interpretative." ("This revised definition reflects the Department's understanding of the best interpretation of the statute, and it is immediately effective. See 5 U.S.C. 553(d)(2).") 88 FR 6480. "Interpretive rules…do not have the force and effect of law and are not accorded that weight in the adjudicatory process. *Shalala v.*

*Guernsey Memorial Hospital*, 514 U.S. 87, 99 (1995). In *Mortgage Bankers*, we held that interpretive rules, even when given *Auer* deference, do not have the force of law. See 575 U. S., at ——, and n. 4, 135 S.Ct., at 1208, and n. 4. An interpretive rule itself never forms the basis for an enforcement action—because, as just noted, such a rule does not impose any legally binding requirements on private parties." [internal quotes omitted] *Kisor v. Wilkie*, 139 S. Ct. 2400, 2420 (2019) citing *National Min. Assn. v. McCarthy*, 758 F.3d 243, 251 (CADC 2014).

Yet it is clear the Rule is intended to have the force and effect of law from the sweeping provisions of the Rule and its broad threats of felony prosecutions against millions of people. "A legislative rule is one that has legal effect or, alternatively, one that an agency promulgates with the intent to exercise its delegated legislative power by speaking with the force of law." *Natural Resources Defense Council v. Wheeler*, 955 F.3d 68, 83 (D.C. Cir. 2020) (cleaned up). Thus, the Rule is a substantive or legislative rule, and Defendants could not lawfully have the Rule take immediate effect. At the very least, these violations justify an immediate nationwide temporary restraining order and a preliminary injunction. At most, this is cause to permanently enjoin enforcement and hold the Rule unlawful and set it aside.

## C. Agency's Classifications Are Arbitrary and Capricious.

Agency's Rule relies on numerous purportedly "objective" factors to determine whether a braced pistol is a rifle, including (1) rear surface area, (2) weight of the firearm, (3) length of pull, (4) sights or scopes with eye relief that require shouldering of the firearm in order to be used as designed, (5) necessity for the cycle of operations, (6) marketing and promotional materials, and (7) likely use by the community. Rule at 6480. Defendants apparently do not understand the meaning of the word "objective." An objective factor is one based on observable phenomena for

which there is no reasonable disagreement, i.e., uninfluenced by emotions or personal prejudices.[3] Objective means "of, relating to, or being an object, phenomenon, or condition in the realm of sensible experience independent of individual thought and perceptible by all observers; reality independent of the mind."[4]

None of these factors are, as the Rule asserts, "objective." The Rule provides no measure of how much surface area passes the first gateway factor. Defendants do not set upper or lower limits on the weight of the firearm, and those limits in any event would be arbitrary since shooters of varying strength and level of disability could use or need stabilizing braces. The length of pull is arbitrary because the Rule does not account for – and summarily rejected comments saying – that different arm lengths, finger lengths, and forearm sizes would require braces of varying lengths to be useful. The Rule does not state how length of pull will be measured. The Rule does not state how eye relief will be measured or how much loss of scope function would indicate the scope is unusable unless the brace were placed against the shoulder. The Rule does not explain why the lack of necessity of a rearward protrusion for the cycle of operations indicates a firearm will likely be used as a stock rather than a brace. It is obviously arbitrary that marketing materials do not affect the classification as a pistol or rifle, and this is purely subjective Agency judgment.

Finally, how the Agency subjectively perceives the likely use by the community has no bearing on how Plaintiff, or anyone else similarly situated, will use those guns. Indeed, the Rule flatly rejects classifying "weapons based on how a particular individual uses a weapon," Rule at 6484, while holding the contradictory belief that a handful of anecdotes of people using braces as stocks justifies a "likely use in the general community." Rule at 6479, n. 8.

---

[3] American Heritage Dictionary.
[4] Merriam-Webster.

In numerous classification letters from 2012 until 2020, ATF repeatedly affirmed that adding a stabilizing arm brace to a pistol *did not* convert that pistol into an SBR. Exhibits 3—7. Betwixt those classifications, Agency determined that braces were illegal if they could not be used as a brace, could only be used as a stock, and were actually used as a stock. Rule at 6491—92, n. 50. Even that adverse determination gave the public some clarity. Without any new information it did not know in 2012, the Agency reversed that decision too, and now reverses again; this is the very definition of capricious.

### D. Agency Relied on Factors Congress Did Not Intend for It to Consider

Courts invalidate rules failing to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection' between the facts found and the choice made." *Motor Veh. Manu. Assoc. v. State Farm Auto Mut. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*"), quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962). Agency decisions are arbitrary "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm* at 43.

Neither the NFA nor GCA relies on any of the seven factors identified in the Rule. These factors constitute the Agency's subjective determination that a braced pistol is "designed to be fired from the shoulder" because these features either facilitate firing from the shoulder, are not necessary for a pistol, or that they indicate "intent" to fire from the shoulder. This runs afoul of the Supreme Court's holding in *Thompson/Center Arms*, *infra.*, that if there exists at least one lawful Title I configuration of a firearm from its components, a court cannot presume the intent to make an unlawful SBR.

Plaintiff's Q Honey Badger demonstrates that none of Defendants' criteria implies the firearm was "designed to be fired from the shoulder." Plaintiff can hold and fire his fully loaded 9.14-pound Honey Badger using only one hand and the stabilizing brace. Exh. 1, Fig. 13. Plaintiff could fire his Honey Badger using the attached bipod without placing the brace against his shoulder. *Id.*, Fig. 12, 46. Plaintiff could still see a crystal-clear reticle on his scope – with an eye relief of only 3.5 inches – with his eye more than 20 inches from the ocular lens. *Id.*, Fig. 6.

For the third rule in a row, Defendants try to rely on a firearm or accessory manufacturer's marketing materials to determine whether a firearm violates the NFA or GCA. If a manufacturer were to claim that a semi-automatic firearms was a machinegun, this would not actually make it a machinegun; the gun is classified as what it is, not what someone purports it to be. In the instant case, Defendants determined that placing a braced pistol against your shoulder *did not* convert the firearm to a short-barreled rifle. As a direct consequence of this determination, firearm and brace manufacturers, and shooters began to say that ATF allowed people to shoulder a brace without violating the NFA or GCA. Yet now, Agency attempts to use these lawful responses *to its own determination* as evidence manufacturers designed braces to be used as stocks and the public uses them as stocks. Bad faith in rulemaking does not get much worse than this.

The Agency's subjective determination that shooters do not "need" a brace for very light weapons, or cannot use a brace for very heavy weapons, is arbitrary and capricious. It is simply impossible for any firearm owner to evaluate whether the weapon he possesses violates the NFA or the GCA under the Rule. Defendants rely on people's *fear* of prosecution to self-regulate away their rights.

**E.  Plaintiff's Guns Show the Rule Is Arbitrary and Based on False Conclusions.**

Plaintiff owns a Q Honey Badger pistol that Defendants *expressly* consider an SBR because of its rear surface area and resemblance to a stock, its barrel length of 7 inches, and its weight of 4.4 pounds. Rule at 6514. Plaintiff's Honey Badger is equipped with a Nikon P-300 scope with a published eye relief of 3.8 inches. Exh. 1, Figures 4, 5, 12. The Honey Badger weighs in at 9.14 pounds with a loaded 30-round magazine, a scope, a visible and infrared laser, a bipod, and a suppressor. *Id.*, Figures 15—16. It has an overall length of more than 32 inches with the suppressor and more than 24 inches without the suppressor. The Court can easily see that Plaintiff is able to hold the nine-pound gun with one hand by using the stabilizing arm brace. *Id.*, Figure 13. Plaintiff's nine-pound gun weighs more than 99 out of the 100 guns Defendants list in their Rule as typical weights for rifles. Rule at 6514—15. Plaintiff's Honey Badger is equal to or longer than 25 of the 74 firearms Defendants list in the Rule. *Id.*

Using the Honey Badger with its bipod and Plaintiff's eye more than 20 inches from the ocular lens of the Nikon scope, he can see the reticle with crystal clarity. *Id.*, Figure 7. Using the brace with his supporting hand and tilting the gun 90 degrees to the left, Plaintiff can easily obtain a full field of view with a crystal-clear reticle on the Nikon scope. *Id.*, Figure 14. Thus, Defendants' vague reliance on "eye relief," presumably from published or measured distances (and not stated in the Rule), fails to demonstrate that magnified optics with low eye relief cannot be used with a braced pistol. Published eye relief is at *maximum magnification* and *full field of view*. Users are not required to maximize these desirable features.

Similarly, Plaintiff can easily use his Ruger 10/22 pistol as a braced pistol. Exh. 1, Figs. 42—45. By slightly canting the gun to the left, Plaintiff can use the brace and still obtain a sight picture with a red dot sight with infinite eye relief. *Id.* Fig. 44.

Even if a braced pistol is equipped with an optic with limited eye relief, shooters are not required to – and cannot be assumed to – use that optic. Plaintiff's QHB and Ruger 10/22 are equipped with aiming lasers in addition to optics. Exh. 1, Figs. 12, 42, 43, 45. The Ruger 10/22 Charger pistol, with no stock or brace, was designed for hunting small game with a bipod and scope, demonstrating a shooter *can* use the gun and scope without shouldering it. *Id.*, Fig. 46.

Depending on how length of pull is measured, which the Rule does not state, Plaintiff's Q Honey Badger has a length of pull of 8.5 inches with the brace fully collapsed, about 13 inches when measured horizontally to the midpoint of the fully extended brace, about 13.5 inches when measured flush with the rearmost part of the brace, and about 13.7 inches when measured diagonally. *Id.*, Figures 8—10. By the Agency setting a bright line of 13.5 inches for length of pull, Plaintiff's firearm is precariously close to being an illegal stock under the Rule, and even small measurement errors, the position of the measurer's eye relative to the gun and measuring tape, and arbitrary choices on whether to use the rearmost, center, or closest point of the brace could result in Plaintiff being a felon or not. If the length of pull were two inches longer (15—15.7"), Plaintiff could still attach the brace to his forearm. *Id.*, Fig. 7.

### F. <u>The Rule Violates the Second Amendment</u>

#### 1. <u>Braced Pistols and SBRs are Bearable Arms Presumptively Protected by the 2A.</u>

The U.S. Supreme Court has held that the Second Amendment to the United States Constitution presumptively protects an individual right to keep and bear arms for self-defense. *New York State Rifle & Pistol Assn., Inc. v. Bruen* ("*Bruen*"), No. 20-843, at *1 (June 23, 2022). "[T]o justify a firearm regulation, the government must demonstrate that the regulation is consistent with the Nation's historical tradition of firearm regulation." *Id.* "The Second Amendment is the very product of interest balancing by the people, and it surely elevates above

all other interests the right of law-abiding, responsible citizens to us arms for self-defense. *Id.*, citing *District of Columbia et al. v. Heller* ("*Heller*"), 554 U.S. 570, 635 (2008) [internal quotes omitted]. "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Bruen* at \*24. "Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Id.* "We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes," *Heller* at 625. The need for armed self-defense is perhaps most acute in the home. *Heller* at 628.

### 2.  SBRs and Braced Pistols Are in Common Use for Lawful Purposes

By Defendants' own admission, between three and seven million people own pistols with stabilizing arm braces. Rule at 6560; RIA 18. But while the parties may dispute the number of braced pistols in circulation, the U.S. Supreme Court did not rely on something as banal as counting guns when it determined "that handguns are weapons 'in common use' today for self defense." *Bruen* at 2. "Common use" is not defined in numbers or percentages, as if the public is voting on which weapons are most useful for their purposes. The word "common" has two relevant senses. The first is "of or relating to a community at large."[5,6] That is, the word common means guns that are possessed by "law-abiding citizens with ordinary self-defense needs" *Bruen* at \*1. The second sense of "common" means "widespread; prevalent,"[7] and "occurring or appearing

---

[5] Merriam-Webster.

[6] *Ibid.*

[7] American Heritage Dictionary.

frequently,"[8] "happening often; existing in large numbers or in many places,"[9,10] "occurring, found, or done often; prevalent."[11]

The *millions* of braced pistols in circulation plus hundreds of thousands more SBRs are clearly "common" and "widespread" among American firearm owners. Indeed, the Rule *relies* on these weapons becoming more common each year. ("in light of the proliferation of various 'stabilizing brace' models...") Rule at 6556. ("Since [2012], the variety of available 'stabilizing braces' or similar 'brace' devices and pistols equipped with 'braces' has grown significantly.") Rule at 6479. "The demand and production for ''stabilizing braces'' did not appear to take off until 2017...This relatively recent rise in popularity..." Rule at 6560. From 2012 to 2020, Defendants processed more than 250,000 ATF Form 1 applications to make NFA firearms, the vast majority of which are SBRs.[12]

Defendants will likely argue there are a relatively low number of registered SBRs – about 532,725.[13] Yet this is a circular argument that SBRs can be regulated because they are uncommon, but they are uncommon because they are regulated by the NFA. As inflation eroded the burden of the fixed NFA tax over time, more and more people have found it worthwhile to pay the tax to obtain NFA-regulated items. ATF Form 1 processing has increased nearly eight-fold from 5,169 applications in 2010 to 40,790 in 2020. ATF Form 4 transfers have increased more than seven-fold from 33,059 to 246,806 during the same period.[14]

---

[8] Merriam-Webster.
[9] Oxford Dictionary
[10] Wiktionary
[11] Google Dictionary
[12] *Firearms Commerce in the United States*, Annual Statistical Update 2021, p. 13.
[13] *Ibid.*, pp. 15-16.
[14] *Ibid.*, p. 13

3.  There Are No Historical Analogues of Regulating SBRs and SBSs.

Defendants did not and cannot identify any historical record of regulating short-barreled shotguns, short-barreled rifles, or braced pistols to the Founding era. Plaintiff's *Verified Complaint* demonstrates SBRs and SBSs have been in common use for lawful purposes since before the ratification of the Second Amendment. *Complaint* ¶¶ 67—78. See also Exhibit 1, Figures 24—32.

While persons and militaries in the Founding era preferred long-barreled weapons, there is no evidence that they ever *restricted* short-barreled weapons. The purpose of requiring longer-barreled muskets for militia service had nothing to do with any contemporaneous sentiment that short-barreled rifles were the weapons of criminals with no relation to the military service. The purpose was to ensure uniformity among the weapons used by military units, and to maximize the velocity of the heavy projectile in an ill-fitting barrel that allowed propellant gases to bypass the ball; the requirement was practical, not a matter of law. Long barreled weapons also facilitated the use of bayonets, for which length confers a distinct advantage. And, of course, the requirement to bring a long-barreled musket to a militia muster is not a prohibition on the keeping and bearing of short-barreled muskets for other purposes.

Defendants will likely argue that the eighty-nine year old NFA and the fifty-five year old GCA are firmly rooted in this Nation's historical regulation of firearms. First, as the U.S. Supreme Court explained, the proper inquiry is whether such regulations were firmly rooted at the time the Second Amendment was ratified according to its historically fixed meaning. *Bruen* at 2. Second, *Bruen* now calls both statutes into question in a newfound light that previous courts had not examined when they upheld the NFA under an improper interest-balancing test and without acknowledging an individual right to bear arms. It is obvious that if the NFA contained the

regulation of handguns, as it was originally written, *Bruen* would have struck down at least that portion of the statute.

### 4. SBRs Are Neither Dangerous Nor Unusual

By technical and statutory definition, firearms use the energy from an explosive charge to push a projectile down the barrel toward its target. As soon as the projectile exits the barrel at the muzzle, it begins to lose velocity because hot gases are no longer pushing it from behind. Generally, the longer the barrel, the higher the velocity of the projectile because the expanding gases inside the barrel will have more time to push the projectile.[15] Kinetic energy is equal to one-half the mass of the projectile times the velocity squared (KE = 0.5 mV²). Because velocity is squared, increases in velocity will have a proportionally larger effect on kinetic energy. For example, firing a 55-grain bullet (3.56 grams) from a 5.56mm rifle with a 10.5-inch barrel will have a muzzle velocity of 2,739 feet per second[16] (fps) and 1,240.6 joules of energy.[17] The same bullet fired from a 16-inch barrel would have a muzzle velocity of 3,132 fps and 1,622.2 joules of energy – a 14.3 percent increase in velocity results in 30.8 percent more kinetic energy. Thus, a projectile from a firearm with a shorter barrel has *less* kinetic energy, and less terminal effects on the target. Slower projectiles also have less range because the vertical force of gravity is independent of the horizontal rate of travel.

In *Bruen* and *Heller*, the Supreme Court cautioned that nothing in those decisions should raise doubts about longstanding prohibitions of firearm possession by felons and carrying firearms

---

[15] If a barrel is too long, the gases will reach full expansion before the muzzle, and the projectile will slow down inside the barrel. Modern firearm and ammunition manufacturers design their products to not let this happen.

[16] https://theprepperinsider.com/ar-15/barrels/length-velocity-chart/

[17] https://www.calculatorsoup.com/calculators/physics/kinetic.php

into sensitive places. *Heller* at 571. In gratis dicta unrelated to the facts and issues of those cases, the Supreme Court remarked that it would be a "startling reading" of *U.S. v. Miller*, 307 U.S. 174 (1939) that "restrictions on machineguns might be unconstitutional." *Heller* at 624. Startling as that may be, the Court did not consider the constitutionality of regulating machineguns, and it certainly did not consider or mention the regulation of short-barreled rifles. Similarly, the High Court considered the constitutionality of regulating short-barreled shotguns in *Miller* and found in the government's favor only because the case was undefended by Mr. Miller, who was deceased. The Court refused to take judicial notice that short-barreled shotguns had been used in combat, and the Court held that it could not conclude that SBSs were part of the "ordinary military equipment or that its use could contribute to the common defense." Thus, the decision in *Miller* turned on a factual issue, not an issue of law.

By mere assertion, Defendants attempt in their Rule to shoehorn the "dangerous and unusual" language in *Bruen* and *Heller* into their basis for concluding SBRs can be lawfully regulated. Rule at 6481. That is, Defendants claim that SBRs are "dangerous and unusual" for no reason other than they were included in the NFA, which is now under scrutiny in this suit and others. Yet neither Defendants nor Congress can declare by executive or legislative fiat that particular weapons are "dangerous and unusual" for the purposes of this Court's analysis. It is the physical characteristics of the guns and the history of their regulation, not political dicta, that determines whether they are protected by the Second Amendment. If Defendants or Congress could declare weapons "dangerous and unusual," they could simply declare that handguns are "dangerous and unusual" and ban the very instruments that *Heller* and *Bruen* said were protected by the Second Amendment. Indeed, the initial draft of the NFA written by Defendants sought to regulate handguns among the other regulated firearms. Congress did not drop that provision

31

because they concluded handguns were not as dangerous as the other weapons, but because such regulation would be highly unpopular. *Hearings Before the Committee on Ways and Means*, House of Representatives, Seventy-Third Congress, Second Session on H.R. 9066, Apr. 16, 18, and May 14, 16, 1934 ("*NFA Hearings*").

Nothing in the text or legislative history of the NFA stated short-barreled rifles were especially dangerous or unusual. Indeed, short-barreled rifles were added to the NFA as an afterthought when a Congressman from Minnesota erroneously believed his hunting constituents would be adversely affected by the NFA; he oddly suggested that adding SBRs would provide them protection when, in fact, the absence of SBRs from the legislation protected them.

> Hon. Knutson: General, would there any objection, on page 1, line 4. After the word 'shotgun' to add the words 'or rifle' having a barrel less than 18 inches? The reason I ask that is I happen to come from a section of the State where deer hunting is a very popular pastime in the fall of the year and, of course, I would not like to pass any legislation to forbid or make it impossible for our people to keep arms that would permit them to hunt deer.
>
> AG Cummings: Well, as long as it is not mentioned at all, it would not interfere at all.
>
> Hon. Knutson: It seems to me that an 18-inch barrel would make this provision stronger than 16 inches, knowing what I do about firearms.

*NFA Hearings* at 13.

When reaching its decisions in *Bruen* and *Heller*, the High Court found unpersuasive the data that handguns are used in most firearm homicides. Thus, whether a weapon is "dangerous" in the meaning of *Bruen* and *Heller* is not a matter of counting bodies falling beneath the weapon's wrath or how it could conceivably be used in mass killings. Rather, *Heller* and *Bruen* declared handguns were in common use for lawful purposes, and there were no historical analogues of regulating handguns at the time of the ratification of the Second Amendment or long thereafter.

SBRs (and braced pistols) are indeed bearable arms useful in self-defense. Plaintiff uses an APC-45 SBR, a Glock 17 SBR, a Sig Sauer P320 SBR, a Remington 870 SBS, and a Mossberg Shockwave for home defense. *Compl.* ¶ 251. These shorter weapons are ideal for home defense because they can easily be wielded through narrow doorways and hallways, just as they are used by police and military. *Compl.* ¶ 64—65. Their shorter stature and comparatively lighter weight than longer-barreled firearms allow Plaintiff to attach silencers and flashlights while keeping the length and weight relatively short and light. *Id.* Silencers and lights are especially important on home defense guns when Plaintiff must awaken in the middle of the night without any hearing protection. The silencer reduces the flash, report, muzzle rise, and infrasonic compression waves of using a firearm, which are not features of firearms but undesirable bugs.

Defendants admit that *millions* of people own braced pistols on top of the millions who already own registered SBRs. Such ownership could possibly be up to 40 million guns. Exhibit 2. Yet the anecdotal evidence of criminal uses of braced pistols numbers, at most, reveals fewer than 200 instances of criminal misuse of braced pistols in the eleven years from 2012 until 2022.

The sole remaining argument Defendants have about the "danger" of SBRs is that they are "easily concealable." It is obvious that a pistol without a stock or brace is much shorter, and hence more easily concealed, than an identically functioning SBR or braced pistol. *See* Exh. 1, Fig. 37 comparing the pistol without a brace (top) with the braced pistol (second from top) and the SBR (bottom). The Rule provides no evidence braced pistols have been concealed prior to the few unlawful uses Defendants identified. This highlights a crucial difference between "concealable" and "concealed." While there is arguably some history of government regulation prohibiting concealed weapons, Defendants can cite no historical analogues prohibiting weapons that are

concealable. Indeed, no firearms are more concealable than handguns, which are presumptively protected by the Second Amendment.

### G.  Defendants Cannot Rewrite the NFA or GCA.

"When a court is confronted with a clear need for regulatory action under a statute which did not anticipate the condition which created the regulatory problem or provide the means for dealing with it, there is a temptation to approve good-faith agency efforts despite the agency's apparent lack of statutory authority. But this temptation must be avoided, for it is the Congress, not the judiciary, which must act to provide the regulatory agencies with the tools they require. The Court 'is neither empowered to rewrite the language of statutes which may be antiquated in dealing with the most recent technological advances, nor [is it] empowered to make a policy judgment as to whether [the regulations are] in the overall public interest. Therefore, [the Court has] no option but to set aside the regulations . . . as being in violation of the statute." *American Bankers Association v. Connell*, 686 F.2d 953 (D.C. Cir. 1979). Accordingly, an Order granting summary judgment to plaintiffs and setting aside the challenged regulations is filed herewith." *Faic Securities, Inc. v. United States*, 595 F. Supp. 73, 79 (D.D.C. 1984).

That the eighty-nine year old NFA and fifty-five year old GCA failed to anticipate the innovation of braces and modern firearms does not authorize Defendants to unilaterally declare they are encompassed by the NFA and GCA. It is up to *Congress*, not the Agency, to decide whether to regulate braced pistols. Agency did not even consider deferring to Congress to decide the issue, much less explain why they could not. Agency's standard answer in rulemaking to criticism that it failed to consider deferring action to Congress is that the Rule does not preclude Congressional action. This response is not what the APA requires.

34

This is the third President in a row who sought to enact through regulation what he could not pass through Congress. President Obama responded to the deadlock in a divided government over his preferred policies by saying, "I've got a pen, and I've got a phone."[18] President Trump ordered rulemaking to outlaw bump stock devices saying, "I don't care if Congress does it or not, I'm writing it out myself.[19] Now, President Biden seeks to regulate braced pistols "without having to go through Congress."[20] *Compl.* ¶ 286. The Supreme Court struck down rules where agencies attempted to enact provisions expressly rejected by Congress. *West Virginia v. EPA,* No. 20-1530, at *5 (June 30, 2022); *Ala. Ass'n of Realtors v. United States Dep't of Health*, 557 F. Supp. 3d 1, 3 (D.D.C. 2021).

### H. The Rule Attempts to Answer a Major Question Reserved to Congress

The Rule seeks to make between 3 and 7 million (and possibly up to 40 million) firearm owners with guns outfitted with stabilizing braces into instant felons, notwithstanding the Agency's discretionary non-enforcement of many Rule provisions for 120 days. The Rule also affects the rights of every citizen who might wish to use a stabilizing arm brace, every manufacturer of braces, every manufacturer of pistols, and every firearm retailer who would like to sell braced pistols. Even with the Agency's obviously low-balled estimate of 1.4 million affected persons, the Rule's scale and scope are so widespread, its economic and political significance so great, and the burden on the right to keep and bear arms so heavy, that Congress could not have intended to vest Defendants with so much authority. *West Virginia v. EPA*, No. 20-1530, at *3 (June 30, 2022); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-160 (2000). See,

---

[18] https://www.npr.org/2014/01/20/263766043/wielding-a-pen-and-a-phone-obama-goes-it-alone
[19] Public remarks of President Donald J. Trump, Feb. 26, 2018.
[20] President's Remarks on Gun Violence Prevention Efforts, 2021 Daily Comp. Pres. Doc. 298.

e.g., *Alabama Assn. of Realtors v. Department of Health and Human Servs.*, 594 U.S. __, __, 141 S.Ct. 2485 (2021); *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014); *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006); *National Federation of Independent Business v. OSHA*, 595 U.S. __, __.

## I. Lenity and Vagueness Militate against the Rule's Interpretations.

Although the NFA is a tax statute herein construed in a civil setting, "the NFA has criminal applications that carry no additional requirement of willfulness." *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992). Congress provided that while ignorance of the law is no excuse, failure to pay the NFA tax requires specific intent to violate federal criminal tax offenses. 26 U.S.C. § 7201, 7203; *Id.* at 518. "In light of the criminal aspect, the rule of lenity could be deemed to be in play. It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *City of Mesquite v. Aladdin's Castle. Inc.*, 455 U.S. 283, 289-90 (1982) (quoting *Groyned v. City of Rockford*, 408 U.S. 104, 108 (1972)); *Hill v. Coggins*, 867 F.3d 499, 513 (4th Cir. 2017); *Williams v. Johnson*, 1:10cv823 (GBL/IDD), at *8 (E.D. Va. Sep. 12, 2011). "As we recently explained, a criminal statute is void-for-vagueness if it fails to provide a person of ordinary intelligence fair notice of what is prohibited or is so standardless that it authorizes or encourages seriously discriminatory enforcement. This analysis should be conducted bearing in mind the context in which the statute is applied." *United States v. Beason*, No. 11-4676, 2013 WL 1694541, at *2 (4th Cir. Apr. 19, 2013). *United States v. Brewer*, 533 F. App'x 234, 9 (4th Cir. 2013).

What Defendants decry as a "loophole" actually means "lawful." A free citizen can do anything that is not specifically proscribed by law. *Minneapolis St. Louis Ry. Co. v. Gardner*, 177 U.S. 332, 343 (1900). The NFA and GCA are to be enforced according to their own terms.

*Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917); *U.S. v. Jennings*, 323 F.3d 263, 266 (4th Cir. 2003).

Agency argues throughout the Rule that its determination with respect to one brace it examines does not apply to other braces, no matter how similar they are in aspect. "In the NPRM, the Department also noted that ATF issued classification to some makers or manufacturers without having had the benefit of evaluating the 'brace' when attached to a firearm." Rule at 6496. Thus, Agency seeks to impose on law-abiding gun owners a hopelessly indecipherable set of subjective criteria that it alone can determine only after examining a particular weapon. "Given the wide variety of configurations of weapons and 'stabilizing braces,' the rule is 'necessary' or 'needful' to clarify the meaning of [the phrase] [designed or redesigned, made or remade, and intended to be fired from the shoulder." Rule at 6500.

A handgun is defined by the GCA as "a firearm which has a short stock and is designed to be ***held and fired by the use of a single hand***," and "any combination of parts from which" a handgun "can be assembled." [emphasis added] 18 U.S.C. § 921(a)(30). A pistol, which is a type of handgun, is defined as "a weapon originally designed, made, and intended to fire a projectile from one or more barrels ***when held in one hand*** that has both a chamber as an integral part of, or permanently aligned with, the bore and a short stock designed to be gripped by one hand at an angle to and extending below the line of the bore." [emphasis added] *See* 27 C.F.R. 478.11 and 479.11. A rifle is defined by the GCA as "a weapon ***designed or redesigned, made or remade, and intended to be fired from the shoulder*** and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifle bore for each single pull of the trigger." [emphasis added] 18 U.S.C. § 921(a)(7).

37

In prior determinations, Agency properly determined that if a brace on a pistol *can be* used as a brace with one hand, then the firearm is classified as a pistol. The Rule flips this approach on its head, now deciding that if a brace on a pistol *can be* used against the shoulder, then it *is* a rifle (and SBR). Because a braced pistol could arguably satisfy the definitions both of a pistol (designed to be used with one hand) and a rifle (designed to be fired from the shoulder), the Rule of Lenity demands that the Court rule favorably for the party allegedly violating the law.

In a case directly on point, the U.S. Supreme Court acknowledged that a collection of lawful parts that can be used for nothing except assembling them into a firearm produces a regulated firearm. *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 511 (1992). The fact the Thompson Contender kit contained lawful configurations for a Title I pistol or rifle, and only the *possibility* of making a Title II SBR, the kit did not violate the NFA. *Id*. The Rule concedes that "The Supreme Court in *Thompson/Center* concluded that the 'mere possibility' that a pistol and accompanying kit might be 'use[d] to assemble a regulated firearm' did not establish that the 'combined packaging' of the kit and pistol brough the package within the scope of 'making' a short-barreled rifle. [*Thompson*] at 513." Rule at 6500, n. 78. Similarly, the mere possibility that a shooter can place a braced pistol against his shoulder does not constitute the making of an SBR.

The Rule falsely asserts that a brace on a "heavy" pistol has "no design function other than to facilitate the firing of the weapon from the shoulder." Rule at 6496. The most obvious available design function of a stabilizing arm brace is for use as a stabilizing arm brace; even the *possibility* of using it as a brace falls within the holding in *Thompson*. The Rule expressly rejected comments that if a particular user *can* or *does* use the brace on a pistol, that defeats a finding the firearm is an SBR. Rule at 6484. Plaintiff can easily fire his nine-pound rifle with one hand. Exh. 1, Fig. 13.

The Rule relies on manufacturer "marketing materials," making it impossible for users, like Plaintiff, to understand what marketing statements indicate to the Agency that a braced firearm is intended to be fired from the shoulder. The Rule relies on "likely use of the weapon in the general community," which Plaintiff could not possibly discern by himself. Rule at 6479—6480, 6495. The Rule relies on attached scopes with "eye relief that require the weapon to be fired from the shoulder," Rule at 6480, yet the Rule does not define how limited eye relief must be for Plaintiff to be violating the statutes. The Rule relies on the weight and length of the firearm, yet the Agency provides no guidance on how much or little a firearm must weigh to comply with the statutes. Agency relies on vague classification criteria such as the braced pistol being "similarly designed" to rifles. Worst of all, the Rule relies on these vague factors *in combination*, and neither Plaintiff nor the firearm community could possibly divine how the Agency would weigh each factor and their interactions with one another on their weapons.

### J.   Agency's Interpretations Are Not Deserving of Deference.

This Court should not defer to the Agency's interpretations of statutes because the NFA and GCA are neither vague nor ambiguous about the definitions of a "pistol" and a "rifle." Even if those terms are not clear, the Agency's interpretations are not permissible. *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984).

The NFA and GCA clearly define pistols as weapons designed for use with one hand. The patents and designs of all stabilizing braces demonstrate they were designed for weapons to be fired with one hand, and ***Defendants' determinations from 2012 to 2020 said so***. Using a brace, Plaintiff can easily hold and fire a nine-pound gun with one hand, whereas the front-heavy weapon would tilt forward without the brace. Exh. 1, Fig. 13.

It is irrelevant that a braced pistol *could* be fired with two hands. It is common practice among self defense experts, competitive shooters, police, and military to train handgun shooters to use two hands, yet Defendants do not consider two-handed use of handguns to be making an Any Other Weapon ("AOW"), even when they have design features improving the grip of the non-firing hand. 26 U.S.C. § 5845(e). *See* Exh. 1, Figure 38. Any handgun could, rather ridiculously and dangerously, be fired from the shoulder. This does not alter the fact the handgun was designed to be fired with one hand. Also, the definitions of "rifle" or "any other weapon" do not include "designed to be fired with two hands." That is, a person's use of something other than what it was designed for does not alter its classification under the law.

The NFA and GCA clearly define a rifle as being "designed to be fired from the shoulder." There is no silence or ambiguity in this definition. Braced pistols are explicitly designed and intended to be fired with one hand, not against the shoulder.

Even if the Court finds that the NFA and GCA are ambiguous or silent, the Agency's interpretations are not permissible constructions of the statute. Pistols with braces were designed exactly for the purpose of one-handed firing, and Agency's earlier classifications held exactly that. Even now, Agency admits that *some* braced pistols might not be SBRs depending on the factors the Agency lists in the rule. Clearly, those pistols were designed for one-handed use.

Despite Defendants' misdirection that "many heavy pistols have the receiver of a rifle," Rule at 6518, these receivers are transferred as ***pistols*** based on the Agency's classification. Adding a brace does not change the design from one-handed use, and braces actually *facilitate* one-handed use. The Rule rejects that braces are "purported to assist the shooter [to] stabilize the weapon while shooting with one hand," Rule at 6494, but relies on "objective design features and characteristics that facilitate shoulder fire." Rule at 6479. Defendants simply choose their own

purported use of a firearm over other people's purported use. Defendants expressly say that owners of braced firearms may "remove any offending characteristics to remove the firearm from the purview of the NFA." So, they admit the unadorned AR pistols are pistols. If AR pistols are pistols, and braces facilitate one-handed firing, that is the end of the matter.

Because of all the procedural errors in this rulemaking, the Court should give Agency no deference to its interpretations. "Chevron deference is not warranted where the regulation is 'procedurally defective'—that is, where the agency errs by failing to follow the correct procedures in issuing the regulation. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016).

### K. **The Rule Imposes *Ex Post Facto* Criminal Liability.**

Plaintiff is subject to *ex post facto* criminal liability because, for the first time in regulation, Defendants interpret 18 U.S.C. § 922(r) as applying not just to importers, but to end-users as well. The Rule explicitly states that the law is violated upon *assembly* of the firearm, and replacing foreign-made parts with American-made parts would not cure the violation. Rule at 6564.

The GCA restricts importation of firearms that the Agency unilaterally declares are "not for sporting purposes." 18 U.S.C. § 921. But the decision in *Bruen* has held that the Second Amendment presumptively protects all bearable arms, even those not in existence at the time the Second Amendment was ratified, and the government must demonstrate that restrictions on such weapons are part of the historical understanding of the Second Amendment. Because Plaintiff made SBRs from foreign-made pistols, and because the Rule interprets 922(r) to apply to Plaintiff, and because Defendants do not consider SBRs for "sporting purposes," and because Defendants claim the law violation cannot be cured, Plaintiff is subject to criminal liability for weapons he uses daily for home defense. *Compl.* ¶¶ 65, 251. Indeed, SBRs are used for sporting purposes in United States Practical Shooting Association (USPSA) competitions. "For all long guns (R, SG,

41

and PCC), Short Barreled Rifles (SBR's) are permitted provided the competitor is in full compliance with all state and federal laws and regulations concerning ownership and transport of the SBR and the PCC otherwise complies with Divisional requirements."[21] Exh. 1, Figures 39, 40.

## II.   THE RULE CAUSES PLAINTIFF IRREPARABLE HARM

As pleaded in Plaintiff's *Verified Complaint*, the Rule causes Plaintiff harm that is imminent and ongoing, concrete and particularized, and that setting aside the Rule will afford Plaintiff complete relief. First, the Rule, the NFA, and the GCA infringe upon Plaintiff's rights under the Second Amendment. "The … deprivation of a constitutional right, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022).

On January 31, 2023, Plaintiff became an instant felon by possessing at least five firearms equipped with stabilizing arm braces and numerous foreign-made firearms that he converted to SBRs. Although the Agency exercises its prosecutorial discretion to not enforce the NFA and GCA with respect to braces for 120 days following the Rule, Plaintiff is *immediately* subject to all of the ordinary and usual restrictions on a person possessing a lawful SBR, such as not being able to sell those firearms as Title I weapons, not being able to transport them to other states without Defendants' permission on ATF Form 20, and not being able to transport them to states that allow Title I firearms but not Title II firearms. No later grant of declaratory or injunctive relief will remedy these harms during the pendency of this case.

Since 2020, Plaintiff has been suspended from his job without pay in a blatant act of whistleblower retaliation. To continue to meet his financial obligations each month, Plaintiff has

---

[21] USPSA Rifle, Shotgun and Multigun Rules, March 2023, p. 99.

had to sell firearms, and he intends to sell more in the near future. But the Rule expressly prevents Plaintiff from selling braced pistols without paying a $200 NFA tax and transferring the firearm to a buyer through ATF Form 4, which currently takes more than nine months to process. The tax, the long processing time, and the registration of Plaintiff's braced pistols as SBRs destroy the value of his guns and defeats the purpose of selling them.

Under the Rule, Plaintiff must engrave his braced pistols with his name and location. 27 C.F.R. 479.102(a)(1). Once Plaintiff has engraved his firearms, no future award of damages can remedy the defacement of his lawful property, particularly the serialized receivers, that are a store of value in trade.

Even now, Plaintiff is under imminent risk of search, seizure, and prosecution because of his pleadings in this case regarding firearms that were completely lawful before January 31, 2023.

## III.    BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR PLAINTIFF

If this Court enjoins enforcement of the Rule, there will be no deluge of shootings with braced pistols. In the years between 2012 and 2020, there were fewer than 200 known incidents of crimes *possibly* committed with braced pistols out of *millions* of braces owned by the public and *billions* of lawful uses. Indeed, Defendants do not report any surge in crimes with braced pistols during the period before the Rule became effective. Plaintiff has demonstrated earlier that the Rule will have virtually no benefits for public safety, and enjoining the Rule will cause no harm. The Rule's 120-day non-enforcement indicates further that Defendants do not really believe the Rule is so necessary as to have immediate effect.

Yet every day, the Rule makes Plaintiff and other law-abiding citizens across the nation into felons, putting them at risk of incarceration up to 10 years in prison, fines up to $250,000, loss

of non-compliant firearms, and permanent loss of their Second Amendment rights for each
violation. Plaintiff has demonstrated the balance of equities and public interest weigh in his favor.

## IV.   BONDS, SECURITY, OR SURETIES

Because Defendants will suffer no financial harm if this Court enjoins their enforcement
of this Rule, this Court should either set no requirement for bond or a nominal amount. Plaintiff
has not received a paycheck from his federal employer for more than 2.5 years, Plaintiff has
substantial debt, and his monthly net income is negative, so he cannot afford to pay bond.

## V.   CONCLUSION

For the foregoing reasons, this Court should grant Plaintiff's motion for a nationwide
temporary restraining order, a preliminary and a permanent injunction. The Court should hold the
rule unlawful and set it aside under 5 U.S.C. § 706.

## VI.   RELIEF REQUESTED

WHEREFORE, Plaintiff requests that judgment be entered in his favor and against
Defendants as follows:

1. Declare that the Rule, RIN 1140-AA55, is held unlawful and set aside.

2. Declare that regulation of braced pistols, short-barreled rifles, and short-barreled shotguns
   under the Rule, NFA, GCA, and Defendants' determinations violates the Second Amendment
   to the United States Constitution.

3. Declare that Defendants' Rule and determinations create *ex post facto* liability on Plaintiff.

4. Declare that 18 U.S.C. § 922(a)(4) violates the Second and Tenth Amendments.

5. Declare that the National Firearms Registration and Transfer Record violates the Fourth and
   Fifth Amendments of the United States Constitution.

44

6.  Declare that 18 U.S.C. §922(r) does not apply to end-users purchasing foreign-made pistols who then convert those pistols into braced pistols or SBRs.

7.  Declare that 18 U.S.C. § 922(r) violates the Second Amendment.

8.  Temporarily restrain, and preliminarily and permanently enjoin Defendants from enforcing any provisions of law, rule, or regulation this Court deems violative of law or the U.S. Constitution, in a nationwide injunction.

9.  If this Court does not grant the requested injunctive relief, Plaintiff requests this Court suspend the effective date of the Rule until 120 days after the conclusion of this case.

10. Plaintiff requests immunity from prosecution, search, or seizure based on any pleaded facts in this case.

11. Order Defendants to provide a tax-exempt transfer of all firearms Plaintiff registers as an individual pursuant to the Rule to his Trust.

12. Enter an order awarding Plaintiff his costs of this suit, including any attorney fees and costs pursuant to 42 U.S.C. §1988 and damages.

13. Order any other that the court deems just and appropriate.


I hereby certify and verify under penalty of perjury under the laws of the United States that the foregoing is true and correct. 28 U.S.C. §1746. No attorney has prepared or assisted in the preparation of this motion.

EXECUTED ON March 10, 2023.

-s- _____

Robert M. Miller, Ph.D.
4094 Majestic Ln., #278
Fairfax, VA 22033
(415) 596-2444
RobMiller44@hotmail.com

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on March 10, 2023, a copy of the foregoing

**APPLICATION FOR A NATIONWIDE TEMPORARY RESTRAINING ORDER AND A**

**PRELIMINARY AND PERMANENT INJUNCTION** was sent to the Court by certified

Priority U.S. Mail.

I caused a copy of this filing to be served by certified Priority U.S. Mail and CM/ECF to:

U.S. Attorney for the Eastern District of Virginia          Steven Dettelbach, Director
ATTN: Civil Process Clerk                                               Bureau of Alcohol, Tobacco, Firearms,
Justin W. Williams U.S Attorney's Building                    and Explosives
2100 Jamieson Ave                                                        99 New York Ave, NE
Alexandria, VA 22314                                                   Washington, DC  20226


Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Ave, N.W.
Washington, D.C. 20530-0001

_____
Robert M. Miller
*Plaintiff, Pro Se*